# EXHIBIT "A"

Court of Common Pleas of Philadelphia County
Trial Division

# Civil Cover Sheet

For Prothonotary Use Only (Docket Number)

**SEPTEMBER 2022**

E-Filing Number: 2209027217

**001284**

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| JOSHUA OTERO | CHRISTIAN KANE |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| 4247 K. STREET<br>PHILADELPHIA PA 19124 | PHILADELPHIA POLICE DEPARTMENT 15TH DISTRICT<br>2831 LEVICK STREET<br>PHILADELPHIA PA 19149 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | ALEXANDER HERNANDEZ |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | PHILADELPHIA POLICE DEPARTMENT 15TH DISTRICT<br>2831 LEVICK STREET<br>PHILADELPHIA PA 19149 |

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| | CITY OF PHILADELPHIA |

| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
|---|---|
| | DEPARTMENT OF LAW CITY HALL, 17TH FLOOR 1515<br>ARCH STREET<br>PHILADELPHIA PA 19102 |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION | | |
|---|---|---|---|---|
| 1 | 5 | ☒ Complaint<br>☐ Writ of Summons | ☐ Petition Action<br>☐ Transfer From Other Jurisdictions | ☐ Notice of Appeal |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less<br>☒ More than $50,000.00 | ☐ Arbitration<br>☒ Jury<br>☐ Non-Jury<br>☐ Other: | ☐ Mass Tort<br>☐ Savings Action<br>☐ Petition | ☐ Commerce<br>☐ Minor Court Appeal<br>☐ Statutory Appeals | ☐ Settlement<br>☐ Minors<br>☐ W/D/Survival |

CASE TYPE AND CODE

2V - MOTOR VEHICLE ACCIDENT

STATUTORY BASIS FOR CAUSE OF ACTION

RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER)

**FILED
PRO PROTHY**

SEP **15** 2022

**E. HAURIN**

IS CASE SUBJECT TO
COORDINATION ORDER?

YES          NO

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant: JOSHUA OTERO

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS |
|---|---|
| JAMES J. WALDENBERGER | KLINE&SPECTER<br>THE NINETEENTH FLOOR<br>1525 LOCUST STREET<br>PHILADELPHIA PA 19102 |

| PHONE NUMBER | FAX NUMBER | |
|---|---|---|
| (215)772-1000 | (215)772-1005 | |

| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
|---|---|
| 83837 | jim.waldenberger@klinespecter.com |

| SIGNATURE OF FILING ATTORNEY OR PARTY | DATE SUBMITTED |
|---|---|
| JAMES WALDENBERGER | Thursday, September 15, 2022, 10:13 am |

FINAL COPY (Approved by the Prothonotary Clerk)

**COMPLETE LIST OF DEFENDANTS:**

1. CHRISTIAN KANE
   PHILADELPHIA POLICE DEPARTMENT 15TH DISTRICT 2831 LEVICK STREET
   PHILADELPHIA PA 19149
2. ALEXANDER HERNANDEZ
   PHILADELPHIA POLICE DEPARTMENT 15TH DISTRICT 2831 LEVICK STREET
   PHILADELPHIA PA 19149
3. CITY OF PHILADELPHIA
   DEPARTMENT OF LAW CITY HALL, 17TH FLOOR 1515 ARCH STREET
   PHILADELPHIA PA 19102
4. TAHIR ELLISON
   SCI ROCKVIEW 1 ROCKVIEW PLACE BELLEFONTE
   ROCKVIEW PA 16823
5. JOHN DOES NOS. 1-10
   TBD
   TBD PA TBD

KLINE & SPECTER, P.C.
By:    SHANIN SPECTER, PA ID# 40928
       shanin.specter@klinespecter.com
       JAMES J. WALDENBERGER, PA ID# 83837
       jim.waldenberger@klinespecter.com
       HELEN A. LAWLESS, PA ID# 327249
       helen.lawless@klinespecter.com
1525 Locust Street
Philadelphia, PA 19102
(215) 772-1000/fax: (215) 772-1359
*Attorneys for Plaintiffs*



*Filed and Attested by the Office of Judicial Records 15 SEP 2022 10:13 am E. HAURIN*

---

| | |
|---|---|
| **JOSHUA OTERO, as Administrator of the Estate of VIRGEN MARTINEZ, DECEASED** | COURT OF COMMON PLEAS PHILADELPHIA COUNTY |
| 4247 K. Street Philadelphia, PA 19124 | CIVIL DIVISION |
| Plaintiff, | SEPTEMBER TERM, 2022 |
| -vs- | |
| **P/O CHRISTIAN KANE, in his individual and official capacity** Philadelphia Police Department 15th District 2831 Levick Street Philadelphia, PA 19149 | NO. |
| | JURY TRIAL DEMANDED |
| and | |
| **P/O ALEXANDER HERNANDEZ in his individual and official capacity** Philadelphia Police Department 15th District 2831 Levick Street Philadelphia, PA 19149 | **NOTICE TO DEFEND AND COMPLAINT IN CIVIL ACTION** |
| and | |
| **CITY OF PHILADELPHIA** Department of Law City Hall, 17th Floor 1515 Arch Street Philadelphia, PA 19102 | |
| and | |

Case ID: 220901284

**TAHIR ELLISON**
SCI Rockview
1 Rockview Place
Bellefonte
Rockview, PA  16823

and

**JOHN DOES NOS. 1-10**
(fictious designation of individual(s) who
were employees, servants and/or agents of
the City of Philadelphia, including but not
limited to any officer, supervisor,
dispatcher, and/or other individual, who
was involved in any aspect of the police
chase at issue)

Defendants

---

**NOTICE TO DEFEND**

| NOTICE | ADVISO |
|---|---|
| You have been sued in court.  If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you.  You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff.  You may lose money or property or other rights important to you. | Le han demandado a used en la corte.  Si usted quiere defenderse de estas demandas expuestas en las paginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificacion.  Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona.  Sea avisado que si usted no se defiende, la corte tomara medidas y puede continuar la demanda en contra suya sin previo aviso o notificacion.  Ademas, la corte pueda decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda.  Usted puede perder dinero o sus propiedades u otros derechos importantes para usted. |

<table>
<tr><td>YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE.  IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.</td><td>LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE, SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.</td></tr>
</table>

Lawyer Referral Service
Philadelphia Bar Association
1101 Market Street, 11th Floor
Philadelphia, PA 19107
(215) 238-6338

Asociacion de Licenciados de Filadelfia
Servicio de Referencia y Informacion
1101 Market Street, 11th Floor
Philadelphia, PA 19107
(215) 238-6338

Case ID: 220901284

## CIVIL ACTION - COMPLAINT

### THE PARTIES

1.      Virgen Martinez, Decedent, died in a motor vehicle collision after Philadelphia police officers initiated a high-speed chase at or near Allegheny Avenue in Philadelphia, Pennsylvania, on November 19, 2020.

2.      Plaintiff, Joshua Otero, is an adult citizen and resident of the Commonwealth of Pennsylvania, currently residing at 4247 K Street, Philadelphia, Pennsylvania 19124. On August 24, 2022, Joshua Otero was duly appointed as the Administrator of the Estate of Virgen Martinez (See Letters of Administration attached as Exhibit A).

3.      Defendant Police Officer Christian Kane (hereinafter "Officer Kane") is an adult citizen and resident of the Commonwealth of Pennsylvania, and was at all times relevant to this Complaint, a police officer with Fifteenth District of the Philadelphia Police Department, whose business address is 2831 Levick Street, Philadelphia, Pennsylvania 19149.

4.      Defendant Police Officer Alexander Hernandez (hereinafter "Officer Hernandez") is an adult citizen and resident of the Commonwealth of Pennsylvania and was at all times relevant to this Complaint, a police officer with Fifteenth District of the Philadelphia Police Department, whose business address is 2831 Levick Street, Philadelphia, Pennsylvania 19149.

5.      Defendant City of Philadelphia is a city, political subdivision, governmental entity, and municipality in the Commonwealth of Pennsylvania, organized and existing under the laws of the Commonwealth of Pennsylvania, with a principal place of business at City Hall, Department of Law, 17th Floor, 1515 Arch Street, Philadelphia, Pennsylvania 19102.

Case ID: 220901284

6.      At all times material hereto, Defendant, City of Philadelphia, owned, operated, maintained, was responsible for, and/or otherwise controlled the Philadelphia Police Department, including the 15th District.  At all relevant times hereto, Defendant, City of Philadelphia, was acting through its employees, servants and/or agents, including but not limited to Officers Kane and/or Hernandez, as well as any officer, supervisor, dispatcher, and/or other individual involved in any aspect of the police chase described below.

7.      At all times material hereto, the Philadelphia Police Department provided law enforcement services to the City of Philadelphia.

8.      At all relevant times, Officers Kane and Hernandez were employees, servants and/or agents of the City of Philadelphia, and acting in the course of scope of their employment.

9.      Defendants, John Does 1-10, is a fictious designation for individual(s) who were employees, servants and/or agents of the City of Philadelphia, including but not limited to any officer, supervisor, dispatcher, and/or other individual, who was involved in any aspect of the police chase at issue.

**JURISDICTION AND VENUE**

10.      The preceding paragraphs are incorporated by reference as if fully set forth herein.

11.      This Court possesses subject matter jurisdiction over this matter under PA. CONST. ART. V. § 5 and 42 PA. CONS. STAT. § 931.

12.      This Court possesses personal jurisdiction over each defendant in this matter under 42 PA. CONS. STAT. § 5301(a)(1).

13.      Venue in this action is properly laid in Philadelphia County pursuant to Rules 1006 and 2103 of the Pennsylvania Rules of Civil Procedure, as the City of Philadelphia, a municipal entity, is located within the boundaries of Philadelphia County, Pennsylvania.

4

Case ID: 220901284

14.    The amount in controversy exceeds the local rules for amounts in controversy requiring arbitration.

## OPERATIVE FACTS

15.    The preceding paragraphs are incorporated by reference as if fully set forth herein.

16.    At or about 8:30AM on November 19, 2020, Virgen Martinez was operating a 2003 Chevrolet Malibu, driving northeast bound on Frankford Avenue in Philadelphia, Pennsylvania. There were no other persons in the vehicle.

17.    Upon information and belief, at the same time, Officers Kane and Hernandez were on duty as officers of the Philadelphia Police Department operating a marked police cruiser.

18.    Officer Kane was the operator of the marked police cruiser and Officer Hernandez was the recorder, riding in the passenger seat.

19.    Officers Kane and Hernandez were wearing Philadelphia Police Department uniforms and carrying their badges.

20.    At or before 8:30 A.M. on November 19, 2020, on information and belief, Officers Kane and Hernandez began to pursue Defendant Tahir Ellison, who was operating a 2008 Kia Sportage along Clearfield Street, Philadelphia, Pennsylvania.

21.    Upon information and belief, prior to pursuing Mr. Ellison's vehicle, Officers Kane and Hernandez did not perform a search of Mr. Ellison's vehicle, had not received or corroborated information about Mr. Ellison or Mr. Ellison's vehicle from a named source, did not personally know Mr. Ellison's identity, had not approached or spoken to Mr. Ellison, and had not observed Mr. Ellison engaging in a forceful or violent felony.

5

Case ID: 220901284

22.    Upon information and belief, Officers Kane and Hernandez pursued Mr. Ellison at a high rate of speed, in excess of the posted speed limits, for an unknown distance and length of time.

23.    Upon information and belief, Officer Kane and/or Officer Hernandez activated the lights and sirens of their police cruiser while pursuing Mr. Ellison.

24.    Upon information and belief, Mr. Ellison refused to yield and stop despite being pursued by the officers and fled from the officers' marked vehicle at a high rate of speed, in excess of the posted speed limits, while the cruiser's lights and sirens were activated, in reckless disregard for the safety of pedestrians and motorists alike.

25.    Upon information and belief, Mr. Ellison then turned northbound onto Jasper Street, which is a one-way street in the southbound direction.  Officers Kane and Hernandez continued to pursue Mr. Ellison onto Jasper Street traveling in the wrong direction on this one-way street, while continuing at a high rate of speed, in excess of the posted speed limits, in reckless disregard for the safety of pedestrians and motorists alike.

26.    Upon information and belief, Mr. Ellison continued to refuse to yield despite being pursued by the officers and fled from the officers' marked vehicle at a high rate of speed, in excess of the posted speed limits, while the cruiser's lights and sirens were activated, in reckless disregard for the safety of pedestrians and motorists alike.

27.    Upon information and belief, Officers Kane and Hernandez continued to pursue Mr. Ellison onto East Allegheny Avenue, while still traveling at a high rate of speed, in excess of the posted speed limits, in reckless disregard for the safety of pedestrians and motorists alike, in reckless disregard for the safety of pedestrians and motorists alike.

6

Case ID: 220901284

28.    Upon information and belief, Mr. Ellison still refused to yield and stop despite being pursued by the officers and fled from the officers' marked vehicle at a high rate of speed, in excess of the posted speed limits, while the cruiser's lights and sirens were activated, in reckless disregard for the safety of pedestrians and motorists alike.

29.    Upon information and belief, Decedent Ms. Virgen Martinez approached and legally entered the intersection of Frankford Avenue and East Allegheny Avenue while traveling in accordance with posted speed limits.

30.    Upon information and belief, Mr. Ellison illegally entered the intersection of Frankford Avenue and East Allegheny Avenue vehicle at a high rate of speed, in excess of the posted speed limits, and against a red light.

31.    Upon information and belief, Officer Kane and Hernandez were still pursuing Mr. Ellison, at a high rate of speed, in excess of the posted speed limits, when he illegally entered the intersection of Frankford Avenue and East Allegheny Avenue.

32.    Upon information and belief, Mr. Ellison's vehicle violently struck Ms. Martinez's vehicle in the intersection of Frankford Avenue and East Allegheny Avenue.

33.    At the time of the collision, Ms. Martinez's vehicle was in the right lane on Frankford Avenue crossing East Allegheny Avenue.

34.    Upon information and belief, the front passenger side of Mr. Ellison's vehicle struck the front driver's side of Ms. Martinez's vehicle at a perpendicular angle.

35.    Upon information and belief, at the time of collision, Officers Kane and Hernandez were on East Allegheny Avenue in close pursuit of Mr. Ellison.

36.    Upon arrival of emergency responders, Ms. Martinez was pronounced dead on the scene at approximately 8:50AM.

Case ID: 220901284

37.     The Philadelphia Police Department has established guidelines governing acceptable police practices with respect to police pursuits and high-speed chases. (See "Philadelphia Police Department Directive 9.4, dated June 16, 2016" attached as Exhibit B).

38.     Pursuant to Directive 9.4, an officer may be justified in initiating a vehicular pursuit in only two situations. *See id.*

39.     Pursuant to Directive 9.4, the first situation wherein a vehicular pursuit may be necessary and justified is when the officers are in close proximity to a suspect vehicle and believe a pursuit is necessary to prevent the death or serious bodily injury of another person. *Id.*

40.     Pursuant to Directive 9.4, the second situation wherein a vehicular pursuit may be necessary and justified is when the officers are in close proximity to a suspect vehicle, the officers believe that the pursuit is necessary to prevent the suspect's escape, and the officer has probable cause that the person being pursued has committed or attempted to commit a forcible felony or possesses a deadly weapon, other than the vehicle itself. *Id.*

41.     Upon information and belief, this directive governing police practices with respect to police pursuits was created and promulgated by the Philadelphia Police Department and/or any other institutional authors employed by the City of Philadelphia and was established to protect innocent bystanders and motorists.

42.     Upon information and belief, the vehicular pursuit of Mr. Ellison jointly undertaken by Officers Kane and Hernandez violated Directive 9.4. *See id.* Consequently, it was an unjustifiable pursuit per police directives.

43.     Upon information and belief, Officers Kane and Hernandez did not reasonably believe that the pursuit of Mr. Ellison was necessary to prevent the death or serious bodily injury of another person.

Case ID: 220901284

44.     Upon information and belief, Officers Kane and Hernandez did not believe, and did not possess sufficiently reliable information that would support a reasonable belief, that the pursuit they undertook was necessary to effectuate Mr. Ellison's arrest and to prevent his escape.

45.     Upon information and belief, Officers Kane and Hernandez did not believe, and did not possess sufficiently reliable information to support a reasonable belief, that they had probable cause that Mr. Ellison had committed or attempted to commit a forcible felony.

46.     Upon information and belief, Mr. Ellison did not commit, nor did he attempt to commit, a forcible felony prior to the chase.

47.     Upon information and belief, Officers Kane and Hernandez did not believe, and did not possess sufficiently reliable information to support a reasonable belief, that Mr. Ellison possessed a deadly weapon.

48.     Upon information and belief, Mr. Ellison did not possess a deadly weapon during the vehicular pursuit.

49.     Despite the absence of any information or reasonable belief that would justify a high-speed pursuit according to their own directives, Officers Kane and Hernandez undertook a high-speed chase in a residential and densely populated area of Philadelphia during morning rush hour, even though such a pursuit posed a clear and significant risk to bystanders and motorists, including Ms. Martinez.

50.     By pursuing Mr. Ellison in a residential and densely populated area during morning rush hour, Officers Kane and Hernandez precipitated and continued a high-speed chase that caused Mr. Ellison to strike Ms. Martinez' vehicle. But for the conduct of Officers Kane and Hernandez, Mr. Ellison to strike Ms. Martinez' vehicle, and consequently, Ms. Martinez would not have died.

Case ID: 220901284

51.    Officers Kane and Hernandez's conduct was a substantial factor and/or direct and proximate cause of his vehicle striking Ms. Martinez's vehicle and her harm resulting therefrom, including her death.

52.    By engaging in an unjustified high-speed police pursuit in a residential and densely populated area during morning rush hour, Officers Kane and Hernandez affirmatively used their authority as state actors to create and perpetuate a known and obvious danger to Ms. Martinez, which rendered Ms. Martinez vulnerable to a known, unsafe situation, within the meaning of the state-created danger doctrine under Section 1983 and its progeny.

53.    Defendants, Officer Kane, Officer Hernandez, and the City of Philadelphia, acting under the color of state law, affirmatively caused Plaintiff's Decedent, Virgen Martinez, to be deprived of the rights, privileges, and immunities granted to Ms. Martinez by the Constitution.

54.    By fleeing from police at a high rate of speed, in excess of the posted speed limits, during morning rush hour, despite police operating a marked cruiser and activating their lights and sirens, and illegally entering the intersection of Frankford Avenue and East Allegheny Avenue, Defendant Ellison negligently and recklessly caused his vehicle to strike Ms. Martinez's vehicle.

55.    Defendant Ellison operated his vehicle in a reckless and unsafe manner, and his negligence and recklessness was a substantial factor and/or direct and proximate cause of his vehicle striking Ms. Martinez's vehicle and her harm resulting therefrom, including her death.

56.    As a direct and proximate result of all of the Defendants' conduct, Ms. Martinez was caused to suffer the following:

     a.    Traumatic musculoskeletal and orthopedic injuries;

     b.    Traumatic brain injury;

     c.    Altered level of consciousness;

Case ID: 220901284

d.  Pain and suffering;

e.  Emotional distress;

f.  Mental anguish;

g.  Disfigurement;

h.  Loss of life's pleasures;

i.  Other serious and severe injuries, the exact nature of which are unknown to Plaintiff at this time;

j.  Untimely death;

k.  Loss of care, guidance and tutelage;

l.  all damages allowable under the Survival Act, 42 Pa. C.S.A. §8302, the applicable Rules of Civil Procedure and the decisional law interpreting the Survival Act, including damages for lost earnings of Virgen Martinez between the time of her injury and her death, her total estimated future earning power less her cost of personal maintenance, and/or pain and suffering endured by Virgen Martinez prior to her death, including, but not limited to, physical pain and suffering, mental pain and suffering, mental suffering, loss of life's pleasures, disfigurement, and humiliation; and

m. all damages allowed under the Wrongful Death Act, 42 Pa. C.S.A. §8301, the applicable Rules of Civil Procedure and all decisional law interpreting the Wrongful Death Act, including damages for medical, funeral, and burial expenses, expenses of administration, monetary support Virgen Martinez would have provided during her lifetime, the value of services provided or which could have

Case ID: 220901284

been expected to have been performed in the future by Virgen Martinez, and all

pecuniary losses suffered as a result of Virgen Martinez' death.

57.    Accordingly, Plaintiff, Joshua Otero, Administrator of the Estate of Ms. Martinez,

brings this civil action against Defendants, pursuant to 42 U.S.C. § 1983 and Pennsylvania state

law, and seeks all appropriate damages and remedies cognizable by law.

### COUNT I: CIVIL RIGHTS – 42 U.S.C. § 1983

**Plaintiff v. Officer Kane, Officer Hernandez,**
**City of Philadelphia, and John Does Nos. 1-10**

58.    The preceding paragraphs and allegations are incorporated as though fully set forth

herein.

59.    Defendants Officers Kane and Hernandez were police officers employed by the

City of Philadelphia to enforce Pennsylvania state law and were acting under the color of state law

pursuant to that authority at all times relevant to this litigation. Therefore, they are subject to suit

pursuant to 42 U.S.C. § 1983 for the actions they undertook while acting under the color of state

law.

60.    Defendants, John Does 1-10, is a fictious designation for individual(s) who were

employees, servants and/or agents of the City of Philadelphia, including but not limited to any

officer, supervisor, dispatcher, and/or other individual, who was involved in any aspect of the

police chase at issue.

61.    Defendants' conduct, as set forth above and herein, evinces a state-created danger.

62.    These events did not present Defendants with a hyper-pressurized environment, a

true exigency, or a situation requiring hurried deliberation. Defendants had time to consider

whether to engage in the inherently risky behavior described above.

12

Case ID: 220901284

63.     By engaging in an unjustified high-speed pursuit in a residential and densely populated area, during morning rush hour, while driving the opposite direction on a one-way street, without justification, Defendants consciously disregarded a great risk of serious harm to the safety, bodily integrity, well-being, liberty, and substantive due process rights of Plaintiff's Decedent, Virgen Martinez.

64.     By engaging in an unjustified high-speed pursuit in a residential and densely populated area, during morning rush hour, while driving the opposite direction on a one-way street, without justification, Defendants were deliberately indifferent to the safety, bodily integrity, well-being, liberty, and substantive due process rights of Plaintiff's Decedent, Virgen Martinez.

65.     By engaging in an unjustified high-speed pursuit in a residential and densely populated area, during morning rush hour, while driving the opposite direction on a one-way street, without justification, Defendants actions constituted an intent or purpose to cause harm to the public, including Plaintiff's Decedent, Virgen Martinez.

66.     Defendants acted in conscious disregard of the substantial and unjustifiable risk of causing harm to Ms. Martinez and their conduct was so egregious as to shock the conscience.

67.     Defendants' conduct, as set forth above, demonstrates that the harm caused to Plaintiff's Decedent was a foreseeable and a fairly direct result of Defendants' conduct.

68.     Defendants' conduct, as set forth above, demonstrates that Defendants unreasonably and unjustifiably placed Plaintiff's Decedent in a foreseeably dangerous position.

69.     Defendants' conduct, as set forth above, demonstrates that Defendants affirmatively created an opportunity for harm to Plaintiff's Decedent that otherwise would not have existed. Plaintiff's Decedent was rendered more vulnerable to the danger than had Defendants not acted at all.

Case ID: 220901284

70.     At all times relevant to this litigation, Defendants were aware that Plaintiff's Decedent had a clearly established constitutional right to bodily integrity and a right to be free of the state created danger described herein.

71.     As a direct and proximate result of Defendants' unreasonable, unjustifiable, and unconstitutional conduct, Plaintiff suffered the aforementioned harms, including Ms. Martinez's injuries and untimely death.

72.     Defendants' conduct, as set forth herein, violated Ms. Martinez's rights as guaranteed by the United States Constitution, capable of legal remedy under 42 U.S.C. § 1983.

73.     At all relevant times, Defendants, Officers Kane and Hernandez were the employees, servants and/or agents of the City of Philadelphia, therefore, rendering the City of Philadelphia vicariously liable for their aforementioned actions.

**WHEREFORE**, Plaintiff demands judgment against Defendants, Officer Kane and Officer Hernandez, John Does Nos 1-10, and the City of Philadelphia, for compensatory and punitive damages as indicated above, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages, and costs.

## COUNT II: CIVIL RIGHTS – 42 U.S.C. § 1983 (*Monell* Claim)

### Plaintiff v. City of Philadelphia

74.     The preceding paragraphs and allegations are incorporated as if fully set forth herein.

75.     The City of Philadelphia, as a local government, qualifies as a "person" subject to direct liability under 42 U.S.C. § 1983.

76.     At all times relevant to this litigation, the City of Philadelphia acted under color of state law.

Case ID: 220901284

77.     At all times relevant to this litigation, the City of Philadelphia was a policymaker, whose pronouncements were given the effect of state law.

78.     Upon information and belief, the Philadelphia Police Department's Directive 9.4 related to Vehicular Pursuits was last updated on June 16, 2016.

79.     At the time of this incident, the City of Philadelphia maintained and promulgated a policy, directive, and/or custom and practice governing police pursuits, which resulted in Officers Kane and Hernandez engaging in an unjustified and hazardous high-speed chase in a residential and densely populated area during morning rush hour, thereby causing the violation of Ms. Martinez's rights under the Constitution, 42 U.S.C. 1983; *Monell v. Dep't of Soc'l Serv's*, 436 U.S. 658 (1978), and their progeny.

80.     The City of Philadelphia's maintaining and promulgating an inadequate policy directive, practice, and/or custom governing police pursuits was a moving force behind the unconstitutional harm done to Plaintiff's Decedent.

81.     At the time of this incident, the City of Philadelphia failed to adequately train Philadelphia Police Department officers, including Officers Kane and Hernandez, in the conduct of police pursuits, which resulted in Officers Kane and Hernandez engaging in an unjustified and hazardous high-speed chase in a residential and densely populated area during morning rush hour, thereby causing the violation of Ms. Martinez's rights under the Constitution, 42 U.S.C. 1983; *Monell v. Dep't of Soc'l Serv's*, 436 U.S. 658 (1978), and their progeny.

82.     The City of Philadelphia's failure to properly train its police officers in police pursuits, including Officers Kane and Hernandez, was a moving force behind the unconstitutional harm done to Plaintiff's Decedent.

Case ID: 220901284

83.     As a direct and proximate result of Defendant's unreasonable, unjustifiable, and unconstitutional conduct, Plaintiff suffered the aforementioned harms, including Ms. Martinez' injuries and untimely death.

**WHEREFORE**, Plaintiff demands judgment against Defendant, City of Philadelphia, for compensatory and punitive damages as indicated above, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages, and costs.

## COUNT III: NEGLIGENCE

### Plaintiff v. City of Philadelphia, Officer Kane, Officer Hernandez, And John Does Nos. 1-10

84.     The preceding paragraphs and allegations are incorporated as if fully set forth herein.

85.     At all times relevant to this litigation, Officers Kane and Hernandez were acting within the course and scope of their employment as officers of the Philadelphia Police Department.

86.     Defendants, John Does 1-10, is a fictious designation for individual(s) who were employees, servants and/or agents of the City of Philadelphia, including but not limited to any officer, supervisor, dispatcher, and/or other individual, who was involved in any aspect of the police chase at issue.

87.     At all times relevant to this litigation, the police cruiser that was operated by Officers Kane and Hernandez was under the control of the City of Philadelphia through the Philadelphia Police Department.

88.     At all times relevant to this litigation, Officers Kane and Hernandez owed a duty of reasonable care to foreseeable persons, including Virgin Martinez, to operate their vehicle in a reasonable manner under the circumstances.

16

Case ID: 220901284

89.    As set forth herein, Officers Kane and Hernandez breached this duty by engaging in a reckless high-speed pursuit of Mr. Ellison in a densely populated area at or around 8:30AM.

90.    As a direct and proximate result of the breach of the duty of care Officers Kane and Hernandez owed to Ms. Martinez, Mr. Ellison's vehicle violently collided with that of Ms. Martinez, resulting in her suffering and untimely death.

91.    The conduct of Officers Kane and Hernandez was a substantial factor and/or direct and proximate cause in bringing about the harm done to Plaintiff's Decedent, Ms. Martinez.

92.    The City of Philadelphia is a local agency for purposes of Pennsylvania's Political Subdivision Tort Claims Act. 42 PA. CONS. STAT. § 8501.

93.    The conduct of Officers Kane and Hernandez is covered by an exemption to the immunities granted by Pennsylvania's Political Subdivision Tort Claims Act, namely, the exception for vehicle liability codified at 42 PA. CONS. STAT. § 8542(a)(2), and they are therefore directly liable for the injuries and harms caused to Plaintiff as described above.

94.    As the Officers' conduct is exempted from immunity, and they were acting within the scope of their employment, the City of Philadelphia is vicariously liable for their conduct as their employer under vicarious liability, employment, agency, and/or *respondeat superior*.

95.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered the aforementioned harm, including Ms. Martinez' injuries and untimely death.

**WHEREFORE**, Plaintiff demands judgment against Defendants, Officer Kane, Officer Hernandez, John Does Nos. 1-10, and the City of Philadelphia, for compensatory and punitive damages as indicated above, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages, and costs.

Case ID: 220901284

## COUNT IV: NEGLIGENCE

### Plaintiff v. Tahir Ellison

96.     The preceding paragraphs and allegations are incorporated as if fully set forth herein.

97.     At all times relevant to this litigation, Tahir Ellison operated a 2008 Kia Sportage that eventually collided into Ms. Martinez's vehicle, the Chevrolet Malibu.

98.     At all times relevant to this litigation, Mr. Ellison owed a duty of reasonable care to Virgin Martinez to operate his vehicle in a reasonable manner under the circumstances.

99.     As set forth herein, Mr. Ellison breached this duty by recklessly fleeing from police, who had activated their lights and sirens.

100.    As set forth herein, Mr. Ellison breached this duty by recklessly driving at a high rate of speed, in excess of posted speed limits, in a densely populated area during morning rush hour.

101.    As set forth herein, Mr. Ellison breached this duty by recklessly fleeing from police at a high rate of speed in excess of posted speed limits in a densely populated area during morning rush hour.

102.    As set forth herein, Mr. Ellison breached this duty by illegally entering the intersection at Frankford Avenue and East Allegheny Avenue.

103.    As set forth herein, Mr. Ellison breached this duty by illegally entering the intersection at Frankford Avenue and East Allegheny Avenue at a high rate of speed, in excess of posted speed limits.

Case ID: 220901284

104.    As a direct and proximate result of these breaches of the duty of care Defendant Ellison owed to Ms. Martinez, Defendant Ellison's vehicle violently collided with that of Ms. Martinez, resulting in her suffering and untimely death.

105.    Defendant Ellison's conduct was a substantial factor and/or direct and proximate cause in bringing about the harm done to Plaintiff's Decedent, Ms. Martinez.

106.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered the aforementioned harms, including Ms. Martinez' injuries and untimely death.

**WHEREFORE**, Plaintiff demands judgment against Defendant, Tahir Ellison, for compensatory damages and punitive damages as indicated above, in an amount in excess of the prevailing arbitration limits, exclusive of pre-judgment interest, delay damages, and costs.

## FIRST CAUSE OF ACTION – WRONGFUL DEATH ACT

### Plaintiff v. All Defendants

107.    The preceding paragraphs are incorporated by reference as if fully set forth herein.

108.    Plaintiff, as Administrator of the Estate of Virgen Martinez, brings an action on behalf of Virgen Martinez's beneficiaries, under the Pennsylvania Wrongful Death Act, 42 PA. CONS. STAT. § 8301.

109.    Under the Wrongful Death Act, Virgen Martinez left the following surviving beneficiaries who may be entitled to recover damages: Joshua Otero, Jasmine Aviles, Felix Gonzalez and Jennifer Gonzalez.

110.    As a result of the conduct of all Defendants set forth herein, Virgen Martinez was caused serious injuries and death, entitling her beneficiaries to damages under the Wrongful Death Act, including, but not limited to, the loss of the monetary support that decedent would have provided to her beneficiaries during the decedent's lifetime, including, but not limited to, earnings,

Case ID: 220901284

maintenance, support; services rendered or which could have been expected to have been performed in the future by decedent, and loss of consortium, comfort, society, guidance, and tutelage.

    **WHEREFORE**, Plaintiff, as Administrator of the Estate of Virgen Martinez, demands judgment against all Defendants for the full measure of damages cognizable under the Pennsylvania Survival Act and its interpretive law.

**SECOND CAUSE OF ACTION -  SURVIVAL ACT**

**Plaintiff v. All Defendants**

    111.    The preceding paragraphs and allegations are incorporated as if fully set forth herein.

    112.    Plaintiff, as Administrator of the Estate of Virgen Martinez, brings this action on behalf of the survivors of Ms. Virgen Martinez, under the Pennsylvania Survival Act. 42 PA. CONS. STAT. § 8302.

    113.    Virgen Martinez left the following heirs who may be entitled to share in her estate: Joshua Otero, Jasmine Aviles, Felix Gonzalez, and Jennifer Gonzalez.

    114.    As a result of the conduct of all Defendants, as set forth above, Virgen Martinez was caused grievous injuries and death. The beneficiaries of her Estate are therefore entitled to all of the damages recoverable under the Pennsylvania Survival Act, including, but not limited to: the value of the physical pain and suffering, for embarrassment, disfigurement, humiliation, mental pain and suffering and fright, Ms. Martinez experienced immediately before her death; all pecuniary losses suffered by the Estate as a result of her death, including all loss of income, earnings, retirement income and benefits, and Social Security income, until death, as a result of

Case ID: 220901284

decedent's death; and the total amount that decedent would have earned between today and the end of her life expectancy, including the total amount of future lost earnings and earning capacity

**WHEREFORE**, Plaintiff, on behalf of the Estate of Virgen Martinez, demands judgment against all Defendants, the full measure of damages cognizable under the Survival Act of the Commonwealth of Pennsylvania and its interpretive law.

<u>**DEMAND FOR JURY TRIAL**</u>

Plaintiff demands a trial by jury as to all counts and all issues raised by this Complaint.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

BY:    *s/James J. Waldenberger, Esquire*
SHANIN SPECTER, ESQUIRE
JAMES J. WALDENBERGER, ESQUIRE
HELEN A. LAWLESS, ESQUIRE
ID. Nos. 40928/83837/327249
1525 Locust Street
Philadelphia, PA 19102
(215) 772 -1000/ fax: (215) 772-1359
shanin.specter@klinespecter.com
james.waldenberger@klinespecter.com
helen.lawless@klinespecter.com
*Attorneys for Plaintiff*

Dated:  September 12, 2022

Case ID: 220901284

# **<u>Verification</u>**

I, Joshua Otero, hereby verify that I am the Plaintiff in this action and that the foregoing Complaint is based upon information that I have furnished to my counsel and information that has been gathered by my counsel in the preparation of the lawsuit.  The language of the Complaint is that of counsel and not of the affiant.  I have read the Complaint and to the extent that the allegations therein are based upon information I have given counsel, they are true and correct to the best of my knowledge, information, and belief.  To the extent that the contents of the Complaint are that of counsel, I have relied upon counsel in making this Verification.  I understand that false statements made herein are made subject to the penalties of 18 Pa. C.S. § 4904 relating to unsworn falsifications to authorities.

Date:        09/14/2022          _____

                                                Joshua Otero

# Exhibit A

Case ID: 220901284

# Office of the Register of Wills of Philadelphia County, Pennsylvania

**File #: A4385-2022**

**Commonwealth of Pennsylvania**

**County of Philadelphia**

} **ss.**

I, **TRACEY L. GORDON**, Register for the Probate of Wills and Granting Letters of Administration in and for the County of Philadelphia, in the Commonwealth of Pennsylvania

DO HEREBY CERTIFY AND MAKE KNOWN That on the _____**24th**_____ day of __**August**_____

in the year of our Lord ____**2022**_____        **LETTERS OF ADMINISTRATION**_____

on the Estate of __**VIRGEN DELCARMEN MARTINEZ**_____

Deceased, were granted unto __**JOSHUA OTERO**_____

having first been qualified well and truly to administer the same. And I further certify that no revocation of said Letters appears of record.

Date of death_____**11/19/2020**_____

Given under my hand and seal of office, this __**24th**___ day of __**August**_____, 20_**22**_____

_Deputy Register_

**NOT VALID WITHOUT ORIGINAL SIGNATURE AND IMPRESSED SEAL**

10-14 (Rev. 3/08)

# Exhibit B

Case ID: 220901284

 **PHILADELPHIA POLICE DEPARTMENT     DIRECTIVE 9.4**

| Issued Date: 12-31-08 | Effective Date: 12-31-08 | Updated Date: 06-16-16 |
| --- | --- | --- |

**SUBJECT:   VEHICULAR PURSUITS**
**PLEAC 4.2.1, 4.2.2**

---

## 1.     POLICY AND PURSUIT JUSTIFICATION

    A.  Policy

        1.  The primary consideration when participating in or supervising any pursuit is the safety and welfare of the public, other officers, as well as the suspect(s). Every officer and supervisor must always weigh the benefits of immediate capture with the risks inherent to the pursuit itself.

    B.  Justification for Initiating a Vehicular Pursuit

        1.  An officer is justified in initiating a vehicular pursuit only when they are:

            a.  In close proximity to a suspect vehicle and believes a pursuit is necessary to prevent the death or serious bodily injury of another person, or

            b.  In close proximity to a suspect vehicle and believes BOTH:

                1)  The pursuit is necessary to effect the arrest or prevent escape, <u>AND</u>

*1                  2)  The officer has <u>probable cause</u> to believe that the person being pursued has committed or attempted a forcible felony OR, has <u>probable cause</u> to believe that the person being pursued possesses a deadly weapon, other than the vehicle itself.

| REDACTED - LAW ENFORCEMENT SENSITIVE |
| --- |

---

## 2.     DEFINITIONS

    A.  <u>Vehicular Pursuit</u> -  The use of a motor vehicle to chase, follow, or go after a vehicle that has refused to stop.

**DIRECTIVE 9.4 - 1**

Case ID: 220901284

B. <u>Forcible Felony</u> -  A felony involving actual or threatened serious bodily injury, which include:

Definitions Continued:

1. Murder,
2. Voluntary Manslaughter,
3. Arson Endangering Persons, and
4. Aggravated Assault Causing Serious Bodily Injury

The following felonies shall also be classified as "Forcible" when their commission includes actual or threatened force.  These include:

1. Rape,
2. Involuntary Deviate Sexual Intercourse,
3. Robbery, and
4. Kidnapping.

C. <u>Deadly Weapon</u> -  Any firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or intended to be used, is calculated or likely to produce death or serious bodily injury [18 Pa. C.S. 2301].

\*5            **NOTE:**  For the purposes of this directive, the suspect vehicle is excluded as a deadly weapon regardless of crime committed.

D. <u>Serious Bodily Injury</u> - Bodily injury, which creates a substantial risk of death, or which causes serious, permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ [18 Pa. C.S. §2301].

E. <u>Marked Radio Patrol Sedan</u> – Standard four door marked police vehicle equipped with sirens and overhead lights, such as but not limited to District Patrol Vehicles (RPC), Highway Patrol Vehicle, Narcotics Vehicle, etc.

---

## 3.  GENERAL PURSUIT PROCEDURES AND GUIDELINES

A. Acknowledgment of a pursuit must be made by the District Patrol Supervisor or Police Radio.

B. If no District Patrol Supervisor acknowledges, Police Radio will assign a Supervisor to monitor and control the pursuit.  If the assigned Supervisor fails to acknowledge Police Radio, the Police Radio Room Supervisor will terminate the pursuit.

**DIRECTIVE 9.4 - 2**

Case ID: 220901284

C. If a pursuit is initiated by a Special Unit and a Special Unit Supervisor is not available, Police Radio will assign the pursuit to a District Patrol Supervisor wherein the pursuit is happening.

D. If no justification for the pursuit is given by the initiating unit over Police Radio, it shall be the responsibility of all supervisors on the specific radio band, including the Police Radio Room Supervisor, to immediately terminate the pursuit. Also, any Supervisor is responsible for terminating a pursuit if they believe it has become too dangerous. The decision to terminate shall be final and not be subject to being countermanded.

E. A District Patrol Supervisor assigned to the area in which the pursuit is happening may, based upon his or her knowledge of the District, override any other outside supervisor monitoring and controlling the pursuit.

   **NOTE**: An "outside supervisor" is any supervisor not assigned to the district wherein the pursuit is happening.

F. During a pursuit, no more than two (2) marked radio patrol sedans will pursue a suspect vehicle (i.e. only the Primary and Secondary Units are permitted to engage in a pursuit and that no other vehicles will "caravan" behind the Secondary Unit).

G. Only sworn personnel may engage in a pursuit.

H. All other available sworn personnel (i.e. other than the Primary Unit, Secondary Unit, and Assigned Pursuit Supervisor) should be monitoring police radio and be prepared to stop or divert pedestrian or vehicular traffic that may be in the path of an oncoming pursuit in the areas of assignment. (e.g. Stopping cross traffic at a major intersection in the oncoming direction of a pursuit, etc.)

I. To lessen the possibility of a collision should the fleeing vehicle suddenly stop or change direction, a "safe distance" should always be maintained between the pursued vehicle, the Primary Unit, and Secondary Unit. A minimum of five (5) car lengths should always be maintained during any pursuit. However, a greater distance may be necessary based upon the speed of the pursuit, road and weather conditions, the suspect vehicle's behavior (i.e. how the vehicle is being operated, etc.), the Department's vehicle characteristics, officer's driving experience/capabilities, or any other circumstances that may exist.

J. All marked radio patrol sedans engaged in a pursuit must have, and will operate the police vehicle with emergency equipment activated continuously throughout the pursuit. This includes both light bars and red/blue lights and sirens.

   **NOTE**: Sworn personnel are reminded to use extreme caution when approaching any intersection during a pursuit and only proceed if clear of both vehicles and pedestrians.

**DIRECTIVE 9.4 - 3**

Case ID: 220901284

K. During a pursuit, sworn personnel involved will not switch to another radio band should the pursuit enter another division or jurisdiction. If radio contact is lost for any reason, the pursuit shall be terminated.

L. Once the Secondary Unit arrives to assist, the main function of the Primary Unit is the apprehension of the fleeing suspect(s). The Secondary Unit's main functions are as communications for and backup to the Primary Unit.

M. Only the Primary Unit, Secondary Unit, and the Directing Supervisor may leave their assigned area in response to the pursuit unless ordered not to do so by a higher-ranking officer. No other units may leave their assigned area unless ordered to do so.

*3    N. In all inter-jurisdictional pursuits, the following actions will be taken by all Philadelphia Police personnel: (PLEAC 4.2.1)

1. Sworn personnel in fresh and continuous pursuit may NOT pursue outside of the boundaries of Philadelphia unless permission is granted by a higher ranking supervisor.

2. The initial pursuing officer will notify Police Radio when it is likely that a pursuit will continue into a neighboring jurisdiction. The exception is when the secondary unit arrives and takes over communications.

3. Police Radio will notify the neighboring jurisdiction of the pursuit as soon as possible.

4. When a pursuit is initiated by a law enforcement agency of another jurisdiction, Police Radio will notify the Patrol Supervisor who will immediately inquire into the circumstances surrounding the pursuit and what assistance is required by the pursuing agency,

5. Sworn personnel will not engage in pursuits initiated by other law enforcement agencies unless in accordance with all provisions of this directive. In the districts wherein a pursuit has been initiated by another law enforcement agency, Police Radio will assign the relevant District Patrol Supervisor to monitor and control Philadelphia Police Department personnel.

6. If an arrest is made outside of Philadelphia, but within the Commonwealth of Pennsylvania, the officer will transport the suspect(s) back to the Divisional Detective Headquarters. If an arrest occurs across any state line, the suspect(s) must go through the extradition procedures before being returned to Philadelphia.

Case ID: 220901284

O. Fleeing vehicles will not be stopped under any circumstances by the following techniques:

1. Boxing-In – Surrounding the fleeing vehicles with police vehicles, which are then slowed to a stop with the fleeing vehicle.

2. Ramming – The deliberate act of hitting a fleeing vehicle with a police vehicle for the purpose of forcing the fleeing vehicle off the road or into a fixed object.

3. Roadblocks - The use of barricades, vehicles or other obstructions across a roadway to stop a fleeing vehicle.

*3          4. Pursuit Termination Devices – The use of any pursuit termination or vehicle immobilization device (i.e, stop sticks, spike strips, etc.).  (PLEAC 4.22)

*3   P. Vehicles, other than a marked Radio Patrol Car (i.e., unmarked cars, EPW, SUV, Motorcycle, etc.) shall not, barring exigent circumstances, initiate a vehicle pursuit. However, if a pursuit is initiated based upon exigent circumstances, the operators of these types of vehicles shall relinquish the position as Primary Vehicle to the first responding marked RPC and withdraw from the pursuit immediately.

Q. Police vehicles being used to transport any non-sworn personnel, including but not limited to, prisoners, witnesses, recruits, police explorers, or any "ride-along" shall not engage in a pursuit. Additionally, any unit containing a canine shall not engage in a pursuit.

R. Sworn personnel will immediately terminate any pursuit if the suspect vehicle enters an interstate highway or divided roadway in the wrong direction.

| REDACTED - LAW ENFORCEMENT SENSITIVE |
| --- |

T. Barring extenuating circumstances, all sworn personnel involved in a pursuit in any manner will complete and submit the relevant portion of both Pursuit Memoranda (city and state) found in Appendix "A" of this directive within three (3) days.

---

## 4    SPECIFIC RESPONSIBILITES

A. Initiating/Primary Unit

1. Determine the necessity of commencing or terminating a pursuit by considering:

   a. Whether justification to initiate the pursuit exists (refer to Section 1-B),
   b. Whether the suspect's identification and address are known, thereby making available an alternate means of arrest (e.g. via an arrest warrant),

**DIRECTIVE 9.4 - 5**

    c. The weather and road conditions,
    d. Location and population density (vehicular and pedestrian),
    e. The capabilities and characteristics of the department vehicle,
    f. The officer's own driving capabilities,
    g. The officer's familiarity with the pursuit area,
    h. Any other extraordinary circumstances or conditions (e.g. the proximity to school zones, playgrounds, shopping centers, etc.) and
    i. The speed and control of the suspect vehicle.

2. If a pursuit is initiated, immediately inform the radio dispatcher of:

    a. The fact that a pursuit has been initiated, along with the justification,
    b. The initial location, direction, and estimated distance to the suspect vehicle,
    c. The approximate speed of both the suspect and police vehicles,
    d. The vehicle description and, if possible, license information and a physical and clothing description of the occupants along with approximate ages,
    e. The continuous progress of the pursuit and if headed towards another district, division, or jurisdiction,
    f. Upon arrival of a Secondary Unit, relinquish communication responsibilities to the Secondary Unit.

3. Continuously evaluate the benefits of an immediate capture against the safety of the public, other officers and the suspect. An officer can self-terminate a pursuit at any time.

4. If ordered by a supervisor to relinquish the Primary Unit duties to another radio patrol sedan, immediately withdraw from the pursuit, return to area of assignment, and prepare to complete the relevant portion of the Pursuit Memoranda found in Appendix "A" of this directive.

5. Apprehend the suspect(s), or by ensuring that only the proper amount of force is used to make any arrests consistent with the guidelines in directive 10.2, "Use of Moderate/Limited Force". If the vehicle is stopped and the occupant(s) appear to barricade themselves inside the vehicle, ensure the provisions found in Directive 10.7, "Crisis Response/Critical Incident Negotiations," regarding barricaded persons are implemented.

6. If the Initiating/Primary Unit loses sight of the suspect vehicle, terminate the pursuit immediately and notify Police Radio. Begin a search of the area where suspect vehicle was last seen as directed by the responding supervisor.

7. If any supervisor terminates the pursuit, disengage from the pursuit immediately, safely stop and park the vehicle, notify police radio of location and odometer mileage, update patrol log, and await the arrival of a supervisor.

**DIRECTIVE 9.4 - 6**

Case ID: 220901284

> REDACTED - LAW ENFORCEMENT SENSITIVE

    a.  Return to a safer driving speed,

    b.  Move out of sight of the fleeing vehicle,

    c.  Continuously monitor Police radio as to the direction of the fleeing vehicle,

    d.  Not renew pursuit of the fleeing vehicle if they should make subsequent visual contact and are in close proximity with it, and

    e.  Be prepared for any reports by the flight crew that the fleeing vehicle has stopped and the suspect(s) have fled on foot.

9. If a pursued vehicle is found unattended it should be guarded for prints in an attempt to identify and apprehend the driver and the occupants.

B. Secondary Unit

    1. Upon joining the Primary Unit, acknowledge to Police Radio as the "Secondary Unit".

    2. Maintain visual contact with the primary unit and assume all communication responsibilities such as, reporting the continuous progress of the as indicated in Section 4-A-2, c through f of this directive.

    3. If ordered by a supervisor, relinquish the Secondary Unit duties to another vehicle, immediately withdraw from the pursuit, and return to area of assignment.

    4. Do not pass the Primary Unit unless requested to do so by that Unit or if other conditions exist, such as mechanical malfunction, etc.

    5. Back-up and support the Primary Unit officer(s) consistent with Section 4-A-5 of this directive.

    6. If either the primary unit or any supervisor/commander terminates the pursuit, immediately cease the pursuit.

> REDACTED - LAW ENFORCEMENT SENSITIVE

    8. If a pursued vehicle is found unattended it should be guarded for prints in an attempt to identify and apprehend the driver and the occupants.

C. Assigned Pursuit Supervisor shall:

    1. Direct and control the pursuit and apprehension efforts by:

**DIRECTIVE 9.4 - 7**

Case ID: 220901284

a. Evaluating the Primary/Initiating Unit's justification for commencing and continuing the pursuit,

b. Immediately terminating the pursuit, if necessary, considering all the facts and circumstances including, but not limited to, those factors identified in Section 4-A-1 of this directive,

| REDACTED - LAW ENFORCEMENT SENSITIVE |
| --- |

d. Ensuring the Primary Unit and the Secondary Unit withdraw from the pursuit if Aviation Unit assumes the pursuit and that  pursuit and that they comply with the provisions of Section 4-A-8 and 4-B-7 of this directive respectively.

e. Monitoring all radio transmissions, and ensuring Police Radio is kept informed of location, direction, speed, weather and road conditions, vehicle and pedestrian traffic, etc.

f. Limiting the involvement and radio use by other units.

g. Coordinating other units to respond to strategic locations to possibly apprehend the suspects,

h. Arriving at the scene of any apprehension as soon as possible to ensure the provisions of Directive 10.2, regarding the use of force and, if necessary, Directive 10.7 regarding barricaded persons are strictly observed.

2. If the pursuit was terminated by any supervisor, meet the Primary Unit and Secondary Units and inspect the vehicle odometers, sign officer's log noting location, odometer mileage, and mileage recorded by Police Radio.

3. After any pursuit, if appropriate, make sure officers have sufficient time to calm down and regain their composure before returning to patrol.

4. Supervisors must be proactive at the end of the pursuit to ensure that arrests are made in accordance with departmental policy.  Supervisors will be held accountable if they fail to take appropriate action.

5. If a pursued vehicle is found unattended it should be guarded for prints in an attempt to identify and apprehend the driver and the occupants.

D. Police Radio Responsibilities

1. Police Radio Dispatcher

a. When a Police Radio Dispatcher is notified that an officer is involved in a vehicular pursuit, the dispatcher will:

**DIRECTIVE 9.4 - 8**

Case ID: 220901284

1) Immediately notify a Radio Room Supervisor and 'J' band of the pursuit,

2) Contact and assign the initiating officer's direct supervisor or an available district supervisor to the pursuit, who shall then direct and control the pursuit and any apprehension efforts,

> REDACTED - LAW ENFORCEMENT SENSITIVE

4) Monitor and broadcast the relevant information received from the Initiating/Primary Unit,

5) Once a Secondary Unit has joined in the pursuit, use the Secondary Unit as the communications vehicle unless the Primary Unit is a two-officer vehicle,

6) If the pursuit is terminated by any supervisor, request the location and odometer mileage from the terminated unit and dispatch a supervisor to that location,

7) Assign a separate District Control Number for every pursuit.

2. Radio Room Supervisor Responsibilities

a. Upon being notified by a Police Dispatcher of a pursuit, the Radio Room Supervisor:

1) Will physically respond to the involved console and begin monitoring the pursuit ensuring all responsibilities of the Police Dispatcher in Section 4-D-1 are completed,

2) If no justification for the pursuit is given by the initiating unit or if the initiating unit's supervisor or available district supervisor fails to respond to Police Radio, will immediately terminate the pursuit,

> **NOTE**: If a pursuit is terminated because the initiating unit's supervisor or available District Supervisor failed to respond, the appropriate supervisor's Commanding Officer, Divisional Inspector and the Regional Operations Command will be notified via a Blackberry message.

3) Ensure the notification of Aviation Unit and their availability.

**DIRECTIVE 9.4 - 9**

4) When the pursuit results in an auto accident or injury to police or the suspect vehicle, the Pursuit Broadcast Tapes will be forwarded to the appropriate Commanding Officer.

5) Will generate a daily report of all pursuits, along with a printed copy of all radio transmissions of the pursuit, to the appropriate Commanding Officer for immediate action.

REDACTED - LAW ENFORCEMENT SENSITIVE

F. District/Unit Commanders

1. Will continuously assess the decisions of the assigned supervisor and take control/action if necessary considering all the facts and circumstances including, but not limited to, the factors identified in Section 4-C-1-b of this directive.

2. Shall ensure that copies of the Pursuit Memoranda (city and state) found in Appendix "A" of this directive, the Pursuit Report generated by Police Radio and the radio transmissions are forwarded to the appropriate Deputy Commissioner and the Commanding Officer of the Police Academy, Accident Prevention Section within five (5) calendar days of the pursuit date.

*6

3. The District/Unit Commanders should ensure a copy of the Pennsylvania Police Pursuit Report is forwarded to the Research and Analysis Unit, on the first business day after the pursuit. The original PSP Report will be submitted with the pursuit packet through the chain of command. This is further detailed in Appendix "A" page 6, of this directive.

**DIRECTIVE 9.4 - 10**

Case ID: 220901284

4. Shall ensure the appropriate actions, up to and including formal disciplinary recommendations (75-18s), are taken against any subordinate who has violated any provision of this directive.

G. Appropriate Deputy Commissioner

1. Shall review the Pursuit Memoranda, the Pursuit Report generated by Police Radio and the radio transmissions to ensure that officers and supervisors comply with the procedures and policies set forth in this directive.

---

| RELATED PROCEDURES: | Directive 9.7, | Safe Operation of Police Vehicles |
|---|---|---|
| | Directive 10.2, | Use of Moderate/Limited Force |
| | Directive 10.7, | Crisis Response/Critical Incident Negotiations |
| | Disciplinary Code | |

---

## BY COMMAND OF THE POLICE COMMISSIONER

---

| FOOTNOTE # | GENERAL # | DATE SENT | REVISION |
|---|---|---|---|
| *1 | 2450 | 01-14-09 | Clarification |
| *2 | 4193 | 01-16-09 | Deletion of 1-B-1-b-3 |
| *3 | 4830 | 08-18-15 | Additions/Changes |
| *4 | 1141 | 09-01-15 | Change |
| *5 | 1023 | 04-29-16 | Changes |
| *6 | 4131 | 06-16-16 | Addition |

**DIRECTIVE 9.4 - 11**

Case ID: 220901284



# PHILADELPHIA POLICE DEPARTMENT    DIRECTIVE 9.4

## APPENDIX "A"

| Issued Date: 12-31-08 | Effective Date: 12-31-08 | Updated Date: 04-29-16 |
|---|---|---|

**SUBJECT:  POLICE VEHICLE PURSUIT MEMORANDUM**

---

This memorandum is to be completed regardless of whether or not the violator is apprehended, the length, or duration of the pursuit, or whether or not an accident had taken place.

A copy of the Complaint or Incident Report (75-48) will be included with this memorandum. When available and appropriate, a copy of Accident Report (AA-500 or 75-48C) will accompany it.  It is very important that any vehicle accident involving a police vehicle, the fleeing vehicle, any other civilian or city-owned vehicle or any combination thereof ,be described not only in the AA-500 or 75-48C and the 75-48, but also in this Pursuit Memorandum and the Pennsylvania Police Pursuit Report.

*3/*4  This memorandum must be submitted through the chain of command for review to the Police
*5     Academy, Accident Prevention Section within thirty days.  The Police Academy will retain copies of all State Police Pursuit Reports and AA-500 or 75-48Cs.  The Commanding Officer of the initiating district/unit must ensure that the State Police Pursuit Report is sent to the Research and Analysis Unit.

## MEMORANDUM

TO        : CHIEF INSPECTOR, TRAINING BUREAU
FROM     :
SUBJECT:  PHILADELPHIA POLICE DEPARTMENT PURSUIT MEMORANDUM

DATE OR OCCURRENCE   TIME OF OCCURRENCE_____DAY_____

DISTRICT OF OCCURRENCE ____DIST. CONTROL NUMBER_____

LOCATION PURSUIT INITIATED_____

LOCATION PURSUIT TERMINATED_____

NUMBER OF POLICE UNITS INVOLVED_____

DURATION OF PURSUIT (MINUTES)____DISTANCE (CITY BLOCKS)_____

Case ID: 220901284

JUSTIFICATION FOR PURSUIT AND SPECIFIC VIOLATIONS_____

_____

VIOLATIONS DURING PURSUIT_____

TRAFFIC CONDITIONS (CIRCLE ONE):  HEAVY  MEDIUM  LIGHT  NONE

PEDESTRIAN TRAFFIC (CIRCLE ONE):  HEAVY  MEDIUM  LIGHT  NONE

WEATHER CONDITIONS (CIRCLE ONE):

1 - NO ADVERSE CONDITIONS
2 - RAINING
3 - SLEET, HAIL, FREEZING RAIN
4 - SNOWING
5 - FOG AND SMOKE
6 - RAIN AND FOG

ROAD CONDITIONS (CIRCLE ONE): DRY WET SNOW COVERED ICE COVERED

PRIMARY UNIT   NAME AND RANK OF OFFICER_____

BADGE #_____PAYROLL #--------------------------

DISTRICT OR UNIT/SQUAD AND GROUP___APPOINTMENT DATE___/___/___

RECORDER'S NAME_____BADGE #_____PAYROLL #_____

DISTRICT OR UNIT/SQUAD AND GROUP_____

VEHICLE NUMBER_____TYPE OF POLICE VEHICLE_____

SECONDARY UNIT:  NAME AND RANK OF OFFICER_____

BADGE#_____PAYROLL #_____

DISTRICT OR UNIT/SQUAD AND GROUP_____APPOINMENT DATE___/___/___

RECORDER'S NAME_____BADGE #_____ PAYROLL #_____

DISTRICT OR UNIT/SQUAD AND GROUP_____

VEHICLE NUMBER_____TYPE OF POLICE VEHICLE

**DIRECTIVE 9.4 - 2**
**APPENDIX "A"**

Case ID: 220901284

VIOLATOR'S VEHICLE: MAKE____MODEL_____YEAR_____

COLOR___TAG_____OPERATOR'S NAME_____
DATE OF BIRTH_____ADDRESS_____

CITY/STATE_____

VIOLATOR'S CHARGES_____

OWNER OF VEHICLE_____

PRIMARY OFFICER'S NARRATIVE:  Outline the specifics of the pursuit, including justification. (Use 8" x 11" sheet of white paper should additional space be required.

_____

_____

_____

_____

_____

_____

OFFICER'S SIGNATURE_____DATE_____

SECONDARY OFFICER'S NARRATIVE:  Outline the specifics of your involvement in the pursuit.  (Use 8" x 11" sheet of paper should additional space be required.)

_____

_____

_____

_____

_____

OFFICER'S SIGNATURE_____DATE_____

SUPERVISOR MONITORING PURSUIT: NAME/RANK_____

**DIRECTIVE 9.4 - 3**
**APPENDIX "A"**

Case ID: 220901284

DISPOSITION OF PURSUIT: PURSUIT TERMINATED  YES___  NO___

 (IF YES BY WHOM) NAME/RANK_____

REASON FOR TERMINATION: EXPLAIN_____

_____

_____

ANY MOTOR VEHICLE ACCIDENTS AS A RESULT OF THIS PURSUIT? YES__ NO__

(THIS INCLUDES ALL POLICE VEHICLES, THE FLEEING VEHICLE, AND OTHER
CIVILIAN OR CITY-OWNED VEHICLES THAT MAY HAVE BECOME INVOLVED IN
AN ACCIDENT AS A DIRECT OR INDIRECT RESULT OF THE POLICE PURSUIT.)
(IF YES, EXPLAIN AND ATTACH COPY OF THE 75-48, AND WHEN AVAILABLE, AN
AA-500 OR 75-48C)

_____

_____

ANY POLICE OR CIVILIANS INJURED IN A VEHICULAR ACCIDENT AS A RESULT OF
THIS PURSUIT?  YES__ NO__  (IF YES, EXPLAIN AND GIVE EXTENT OF INJURIES.)
_____

_____

ANY POLICE OR CIVILIAN DEATHS AS A RESULT OF THIS PURSUIT?
YES__ NO _____

IF YES, EXPLAIN_____

_____

_____

ANY VIOLATIONS OF DIRECTIVE 41?  YES___   NO___

 (IF YES, EXPLAIN)_____

_____

**DIRECTIVE 9.4 - 4**
**APPENDIX "A"**

Case ID: 220901284

SUPERVISOR'S NARRATIVE: PER DEPARTMENT POLICY, WAS THIS PURSUIT JUSTIFIED?  YES___  NO___ EXPLAIN AND INCLUDE RECOMMENDATIONS

_____

_____

_____

_____

SUPERVISOR'S SIGNATURE_____BADGE #_____DATE_____

DISTRICT COMMANDING OR COMMAND INSPECTIONS BUREAU COMMENTS:
 (Per Department policy, was this pursuit justified?) YES__ NO__

RECOMMENDATIONS_____

_____

_____

_____

COMMANDING OFFICER'S SIGNATURE_____ DATE_____

*5   INSPECTOR'S
     RECOMMENDATIONS_____

_____

_____

_____

INSPECTOR'S SIGNATURE_____ DATE_____

*5   CHIEF INSPECTOR'S
     RECOMMENDATIONS_____

_____

_____

_____

CHIEF INSPECTOR'S SIGNATURE_____ DATE_____

**DIRECTIVE 9.4 - 5**
**APPENDIX "A"**

Case ID: 220901284

\*5   DEPUTY COMMISSIONER'S
    RECOMMENDATIONS_____

_____

_____

_____

DEPUTY COMMISSIONER'S SIGNATURE_____    DATE_____

ACCIDENT PREVENTION SECTION:

DATE RECEIVED_____BY WHOM_____

RECOMMENDATIONS:_____

_____

_____

TRAINING BUREAU CHIEF'S ACKNOWLEDGEMENT:
(Per Department policy, was this pursuit justified?) YES\_\_\_  NO\_\_\_

        _____
        CHIEF INSPECTOR'S SIGNATURE

        DATE_____

### PENNSYLVANIA POLICE PURSUIT REPORT

Act 154 of 1994 requires police departments in Pennsylvania to make a record of all vehicle pursuits and to report them to the Pennsylvania State Police. The Pennsylvania State Police is required to collect these reports, and to compile an annual summary of information to be reported to various entities. Completion and submission of this form for all pursuits, which occur on or after January 1, 1996, will ensure compliance with the reporting requirements of Act 154.

The detailed information collected through the use of this form will be used to help identify both positive and negative factors influencing the outcome of vehicular pursuits, validate or refute the merits of pursuit policies and apprehension techniques, and to recognize training successes and deficiencies. It is intended that this will enable police departments throughout the Commonwealth to enhance the safety of their officers and the public they serve.

**DIRECTIVE 9.4 - 6**
**APPENDIX "A"**

Case ID: 220901284

The form should be completed by either the primary pursuing police officer or their supervisor, at the discretion of the individual police department. It has been designed to be completed and read without the need for code sheets or overlays. The form may also be completed by agencies assisting the primary pursuing agency. Forms completed by assisting agencies shall not be submitted to the Pennsylvania State Police.

*3/*4  The Commanding Officer of the initiating district/unit shall ensure that original, completed forms are submitted directly to the Research and Analysis Unit as soon as possible. The Research and Analysis Unit shall submit it to the Pennsylvania State Police, upon receipt from the Commanding Officer of the initiating district/unit. Blank forms may be duplicated as necessary. Only original, completed forms shall be submitted to the Pennsylvania State Police. Copies should be made for your records.

Questions concerning the completion of this report should be directed to:

Pennsylvania State Police
Bureau of Research and Development
1800 Elmerton Avenue
Harrisburg, PA  17110
ATTN: Pursuit Reporting Coordinator
(717) XXX-XXXX

## BLOCK INSTRUCTIONS

1. REPORTING AGENCY:  Enter the name of the reporting agency. For agencies having stations at multiple locations, also list the location.

2. REPORTING OFFICER:  Enter the full name of the individual preparing the report.

3. SIGNATURE:  Self-explanatory.

4. INCIDENT NUMBER:  Enter the Incident Number (or case number, etc.) your agency assigns the incident. If an additional vehicle(s) is actively pursued as part of the same incident, that pursuit shall be reported on a separate form, with a supplemental incident number, e.g., A01123456A.

   PSP: Enter the Incident Number as follows: A01123456, S13123456

5. PURSUIT DATE: Enter the date the pursuit began in the following format:

   010296 for January 2, 1996

6. PURSUIT TIME: Enter the time (24 hour clock) the pursuit began.

7. SUPERVISOR'S INITIALS AND BADGE NO.: Self-explanatory.

Case ID: 220901284

8. JURIS NUMBER:   Enter the Juris Number assigned by the Pennsylvania State Police in the five boxes of the block.  If your department has not been assigned a Juris Number, contact the Pennsylvania State Police, Bureau of Research and Development, Management Information and Uniform Crime Reporting Section, at (717) XXX-XXXX.

PSP:   Use the appropriate Station Code, preceded by the number 9 (i.e., 91110 would be entered for Greensburg, Station Code 1110).

9. REASON INITIATED:   Mark the choice which best describes the offense or suspected offense for which the officer INITIALLY decided to pursue the vehicle.  If more than one choice applies, mark the most serious.  Use only an offense known or suspected at the time the attempt to stop was initiated.

EXAMPLE:      If a violator is pursued for a speeding violation, and it is later determined that the vehicle is stolen, then OTHER TRAFFIC should be marked.  If, before attempting to stop the speeder, the officer learns that the vehicle has been reported stolen, then STOLEN OR SUSPECTED should be marked.

DUI OR SUSPECTED - The driver was known to be or suspected of Driving Under the Influence.

OTHER TRAFFIC - Any other traffic violation.

SUMMARY CRIMINAL - Any known or suspected summary criminal offense.

MISDEMEANOR CRIMINAL - Any known or suspected misdemeanor criminal offens

FELONY CRIMINAL - Any known or suspected felony criminal offense, except those relating to the vehicle known to be or suspected of being stolen.

STOLEN OR SUSPECTED - The vehicle is known or suspected to be stolen.

10. TYPE VEHICLE PURSUED:   Mark the choice, which best described the vehicle pursued.

AUTOMOBILE - Passenger cars and mini-vans regardless of the manner in which they are registered.

VAN/PICK-UP/SUV - Full size vans, all pick-up trucks, and sport utility vehicles, even though they may be registered as station wagons.

MOTORCYCLE - All two-wheeled motorcycles, mopeds, motor-driven pedacycles.

**DIRECTIVE 9.4 - 8**
**APPENDIX "A"**

Case ID: 220901284

OTHER - All other vehicles.

11. APPREHENSION: Mark the choice which best describes the apprehension, if any, of the violator.

NONE - VIOLATOR SUCCESSFULLY ELUDED POLICE - Self-explanatory.

NONE - DECISION MADE TO TERMINATE - The pursuit was terminated due to a decision made by the pursuing officer(s) or a supervisor, even though officer(s) were able to continue the pursuit.

NONE - STOPPED, BUT ESCAPED ON FOOT - The pursuit resulted in the violator vehicle being stopped, but the violator escaped on foot.

APPREHENDED DURING PURSUIT - The violator was apprehended during pursuit. This includes during any foot pursuit or search conducted as an immediate continuation of the original pursuit.

DELAYED - AFTER TERMINATION OF PURSUIT - The violator is apprehended after the pursuit is terminated. This includes cases in which the violator is identified through investigation, or if the violator is identified during the pursuit, the decision is made to terminate the pursuit and apprehend the violator at a later time.

12. REASON TERMINATED - Mark the choice which best describes the reason for termination of the pursuit.

PURSUIT DISCONTINUED - Use if the pursuit was terminated by a decision to discontinue.

POLICE ACCIDENT - The pursuit was terminated because the pursuing police vehicle was involved in an accident.

POLICE VEHICLE DISABLED - The pursuit was terminated because the pursuing police vehicle suffered a mechanical failure other than that caused by an accident or collision.

VIOLATOR STOPPED VOLUNTARILY - The violator stopped voluntarily, without the use of road spikes, roadblocks, induced stops, or other apprehension techniques, and surrendered.

VIOLATOR ABANDONED VEHICLE - The violator stopped voluntarily, without the use of road spikes, roadblocks, induced stops, or other apprehension techniques, then fled on foot.

VIOLATOR STOPPED BY COLLISION OR ACCIDENT - The violator was involved in a collision or accident, which terminated the pursuit.

**DIRECTIVE 9.4 - 9**
**APPENDIX "A"**

Case ID: 220901284

VIOLATOR VEHICLE DISABLED - The pursuit was terminated because the violator vehicle suffered a mechanical failure other than that caused by an accident or other police action.

STOPPED BY OTHER POLICE ACTION - The violator was stopped by apprehension techniques other than trailing pursuit, e.g., roadblock, induced stop, etc.

13. COLLISION TYPE: Mark the choices, which describe any collisions occurring during the pursuit.

NO COLLISION – Self-explanatory.

VIOLATOR ACCIDENT - If an accident occurs involving only the violator vehicle.

POLICE ACCIDENT - If an accident occurs involving only a pursuing police vehicle.

UNINVOLVED ACCIDENT - If an accident occurs involving only a vehicle or vehicles not involved in the pursuit, and the accident is a result of the actions of either the violator or police vehicles, e.g., the violator forces an uninvolved vehicle off the road.

VIOLATOR - POLICE ACCIDENT - If an accident occurs involving the violator and pursuing police vehicles.

VIOLATOR - UNINVOLVED ACCIDENT - If an accident occurs involving the violator vehicle and an occupied vehicle not involved in the pursuit.

UNINVOLVED - POLICE ACCIDENT - If an accident occurs involving an occupied vehicle not involved in the pursuit and a pursuing police vehicle.

VIOLATOR - POLICE DEL. INT. (Deliberate intent) - If the violator vehicle was deliberately driven into a police vehicle.

VIOLATOR - UNINVOLVED DEL. INT. - (Deliberate intent) - If the violator vehicle was deliberately driven into an uninvolved vehicle.

POLICE - VIOLATOR LEGAL INTER. (Legal Intervention) - If a police vehicle was deliberately driven into the violator vehicle as an act of legal intervention.

14. APPREHENSION TECHNIQUES:

USED: Mark each apprehension technique used during the pursuit.

END PURSUIT:   Mark one technique most responsible for ending the pursuit, if the violator vehicle was stopped.

Case ID: 220901284

TRAILING PURSUIT - Following the violator vehicle in an attempt to stop it.

ROAD SPIKES - Road Fangs, Spike Strips, Stop Sticks, or other devices designed to deflate the tires of a pursued vehicle.

PARTIAL ROADBLOCK - A roadblock intended to stop or slow the pursued vehicle while allowing the vehicle to pass through or around the roadblock.

TOTAL ROADBLOCK - A roadblock, which completely blocks the pursued vehicle's path, preventing the vehicle from passing through or around the roadblock without striking the roadblock.

ROLLING ROADBLOCK - One or more police vehicles being driven in front of, and in the same direction as, the pursued vehicle.  The police vehicles are then slowed to force the violator vehicle to stop.

OTHER INDUCED STOP - One or more police vehicles being used to force the pursued vehicle to stop.  For the purposes of this report, in an induced stop, there is no attempt to make contact with the pursued vehicle.

LEGAL INTERVENTION - For the purposes of this report, deliberately driving a police vehicle into the violator vehicle in an attempt to stop the vehicle.

FIREARMS - Firearms or long guns discharged at the pursued vehicle or driver.

| REDACTED - LAW ENFORCEMENT SENSITIVE |
| --- |

15. NONPURSUIT RELATED CHARGES:  List the charges filed against the operator and occupants of the pursued vehicle, which are not a result of their conduct during the pursuit, if they are apprehended during the pursuit.  This includes charges previously filed if the violator is fleeing to avoid their capture or the capture of any occupant of the pursued vehicle and the charge for the offense marked in Block 9.  If there are more than four, list the four most serious charges here.  Charges filed in another state should be entered as if they were filed in Pennsylvania.  Check the appropriate space if there are additional non-pursuit-related charges and list them in the continuation/synopsis.

EXAMPLE:    A violator is the subject of an outstanding warrant for burglary and criminal trespass.  During the pursuit, the violator attempts to ram a pursuing police vehicle.  The violator is apprehended during the pursuit, and a search of the vehicle, incident to the violator's arrest, reveals illegal drugs.  CC3502 and CC3503 would be entered in this block (CC2702, aggravated assault, would be entered under Pursuit Related Charges, and the drug violations would be listed under Other Pursuit Related Charges.)

**DIRECTIVE 9.4 - 11**
**APPENDIX "A"**

Case ID: 220901284

In the first two blocks, enter one of the following codes:

CC - Crimes Code
CS - Controlled Substance, Drug, Device and Cosmetic Act
FW - Fireworks Law
GM - Game Law
LL - Liquor Law
VC - Vehicle Code

In the next four blocks, enter the section number. For violations of the Controlled Substance, Drug, Device, and Cosmetic Act, delete the (a). Section 13(a)30 would be coded as 1330.

16. ROAD SURFACE:   Mark the choice which best described the condition of the road surface during the pursuit.

17. VISIBILITY:   Mark the choice which best described the visibility conditions during the pursuit.

DAY/CLR - Daylight, with no atmospheric obscurement, such as fog, rain, snow, etc.

DAY/OBSC - Daylight, with atmospheric obscurement, such as fog, rain, snow, etc.

DUSK/DAWN/CLR - Dusk or dawn, with no atmospheric obscurement, such as fog, rain, snow, etc.

DUSK/DAWN/OBSC - Dusk or dawn, with atmospheric obscurement, such as fog, rain, snow, etc.

DARK/CLR - Dark, with no atmospheric obscurement, such as fog, rain, snow, etc.

DARK/OBSC - Dark with atmospheric obscurement, such as fog, rain, snow, etc.

18. MISC:

PRIMARY PURSUING AGENCY - Mark this if your agency was the primary pursuing agency during the pursuit.

ASSISTING AGENCY - Mark this if your agency was assisting the primary pursuing agency. Only the primary pursuing agency is required to forward this report to the Pennsylvania State Police.

PSP - This report shall be forwarded in accordance with applicable directives regardless of the status of the Pennsylvania State Police as either the primary pursuing agency or an assisting agency.

**DIRECTIVE 9.4 - 12**
**APPENDIX "A"**

Case ID: 220901284

PROBABLE USE DRUGS/ALCOHOL - Mark this if it is suspected that the violator is suspected of being under the influence of drugs or alcohol, regardless of whether charges relating to the use of drugs or alcohol are filed.

PURSUED VEH. OPPOSE TRAFFIC - Mark if the pursued vehicle was driven on a one-way roadway against the normal flow of traffic.

POLICE VEH. OPPOSE TRAFFIC - Mark if any police vehicle actively pursuing the violator was driven on a one-way roadway against the normal flow of traffic.

NOTE: If a police vehicle were driven on a one-way roadway against the normal flow of traffic while not actively pursuing the violator, such as to take a position at a roadblock, this block would not be completed.

19. PURSUIT-RELATED CHARGES:   Mark all the charges resulting from the violator's operation of the pursued vehicle during the pursuit.

20. OTHER PURSUIT RELATED CHARGES:   Enter any other charges resulting from the violator's operation of the pursued vehicle during the pursuit.

21. HIGHWAY:   Mark the type of highway(s) on which the pursuit started, traveled on during the pursuit, and on which the pursuit ended.

22. AREA: Mark the type of area(s) in which the pursuit started, traveled through, and ended.

| | |
|---|---|
| URBAN/BUS | -Urban area or business district |
| SUBURBAN | -Self-explanatory |
| RESIDENTIAL | -Self-explanatory |
| RURAL | -Self-explanatory |

BLOCKS 23 THROUGH 37 - Enter three digits, e.g., enter three as 003, ten as 010, etc.

23. MARKED VEHICLES DIRECTLY INVOLVED:   Enter the number of marked police vehicles directly involved in the pursuit.  Do not include vehicles, which were only utilized in a support role, e.g., roadblocks, etc.

24. UNMARKED VEHICLES DIRECTLY INVOLVED:   Enter the number of unmarked police vehicles directly involved in the pursuit.  Do not include vehicles, which were only utilized in a support role, e.g., roadblocks, etc.

25. VIOLATOR INJURIES:   Enter the number of persons in the violator vehicle who received injuries resulting from vehicular operation during the pursuit.

**DIRECTIVE 9.4 - 13**
**APPENDIX "A"**

Case ID: 220901284

26. POLICE INJURIES:   Enter the number of persons in police vehicles who received injuries resulting from vehicular operation during the pursuit.

27. UNINVOLVED INJURIES:   Enter the number of uninvolved persons who received injuries resulting from vehicular operation during the pursuit.

28. VIOLATOR DEATHS:   Enter the number of persons in the violator vehicle who were killed as a result of vehicular operation during the pursuit.

29. POLICE DEATHS:   Enter the number of persons in police vehicles who were killed as a result of vehicular operation during the pursuit.

30. UNINVOLVED DEATHS:   Enter the number of uninvolved persons who were killed as a result of vehicular operation during the pursuit.

31. VIOLATOR PROPERTY DAMAGE:   Enter the estimated amount of property damage to the violator's vehicle resulting from the pursuit.

32. POLICE PROPERTY DAMAGE:   Enter the estimated amount of property damage to police vehicles resulting from the pursuit.

33. UNINVOLVED PROPERTY DAMAGE:   Enter the estimated amount of property damage to uninvolved property resulting from vehicular operation during the pursuit.

34. NUMBER OF PERSONS IN PURSUED VEHICLE: Self-explanatory.

35. PERSONS IN PURSUED VEHICLE ARRESTED: Self-explanatory.

36. LENGTH OF PURSUIT (MILES): Self-explanatory.

37. TIME ELAPSED DURING PURSUIT (MINUTES): Self-explanatory.

38. VEHICLE: Enter the pertinent information concerning the pursued vehicle.

39. VIOLATOR: Enter the pertinent information concerning the pursued subject.

40. CONTINUATION/SYNOPSIS: Self-explanatory.

PENNSYLVANIA POLICE PURSUIT REPORTING SYSTEM
COMMON REPORTING ERRORS

Block 8  (JURIS NUMBER)

**DIRECTIVE 9.4 - 14**
**APPENDIX "A"**

Case ID: 220901284

This block must be completed.  If you don't know this number, you can obtain it from the person in your department who submits Uniform Crime Report information to the Pennsylvania State Police, or call the number listed below.

Block 9  (REASON INITIATED)
Mark ONLY ONE selection.  If two or more selections could be made, mark only the most serious.  For example, if a violator is pursued for a speeding violation, and it is later determined that the vehicle is stolen, then OTHER TRAFFIC should be marked.  If, before attempting to stop the speeder, the officer learns that the vehicle has been reported stolen, then STOLEN OR SUSPECTED should be marked.  Selection should usually agree with non-pursuit-related charges in block 15.

Blocks 10(TYPE VEHICLE PURSUED), 11 (APPREHENSION), 12 (REASON TERMINATED)
        Mark only one selection in each block.

Block 13 (COLLISION TYPE)
        More than one selection may be marked.

Blocks 11(APPREHENSION), 39 (VIOLATOR)
If a violator is identified in Block 39, some type of apprehension should be indicated in Block 11.

Block 14 (APPREHENSION TECHNIQUES)
There may be more than one selection made under USED.  No more than one selection may be made under END PURSUIT.

One selection under END PURSUIT must be marked, unless NONE-VIOLATOR SUCCESSFULLY ELUDED POLICE or NONE-DECISION MADE TO TERMINATE or DELAYED - AFTER TERMINATION OF PURSUIT are marked in block 11 (APPREHENSION).

Also, OTHER INDUCED STOP refers to one or more police vehicles being used to force the pursued vehicle to stop.  It does not include TOTAL ROADBLOCK, ROLLING ROADBLOCK, and LEGAL INTERVENTION (in legal intervention, a police vehicle is deliberately driven into the pursued vehicle.

Block 15 (NONPURSUIT-RELATED CHARGES), 20 (PURSUIT-RELATED CHARGES)
        Listing charges:

        RIGHT     WRONG
        VC 1543   75 1543

Blocks 15, 19, 20 (NONPURSUIT AND PURSUIT-RELATED CHARGES)
If suspect was not apprehended, no charges should be indicated in Blocks 15, 19, or 20.

Case ID: 220901284

Include charges previously filed if the violator is fleeing to avoid their capture or the capture of any occupant of the pursued vehicle and the charge for the offense marked in Block 9.

For example, a violator is the subject of an outstanding warrant for burglary and criminal trespass. During the pursuit, the violator attempts to ram a pursuing police vehicle. The violator is apprehended during the pursuit, cocaine is found in his vehicle. CC3502 (burglary), CC3503 (criminal trespass, and CS1316 (possession of a controlled substance) would be entered in Block 15 (NONPURSUIT-RELATED CHARGES), CC2702 (aggravated assault) would be entered in Block 19 (PURSUIT-RELATED CHARGES). (The example in the original instructions indicated the drug charges would be considered pursuit-related. This was incorrect.)

NEW FOR 1997 Also include charges exceptionally cleared. For example, if a suspect is killed in the course of the pursuit or other police action related to the pursuit, but otherwise would have been charged with fleeing and eluding, recklessly endangering another person, and aggravated assault, then these charges should be listed in the appropriate blocks.

Block 19, 20 (PURSUIT-RELATED CHARGES)
Charges listed in Block 15 may be listed here also, but only if they are the result of a different incident. For example, aggravated assault is listed in Block 15 because of an outstanding warrant, then the suspect, during the pursuit, rams a pursuing vehicle, resulting in another aggravated assault charge, which would then be listed in Block 20

Blocks 23 through 37
    Enter only whole numbers, in three-digit format

    001    RIGHT
    1.0    WRONG

Blocks 31 through 33 (PROPERTY DAMAGE)
    These amounts must be reported in multiples of $100.

    For example:    005    $500.00
                     050    $5,000.00
                     500    $50,000.00

---

## BY COMMAND OF THE POLICE COMMISSIONER

---

Case ID: 220901284

# EXHIBIT "B"

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

_____

JOSHUA OTERO, as Administrator of    :
The Estate of Virgen Martinez, Deceased  :    NO: 2:22-cv-04141
                                    :
        vs.                    :
                                      :
P/O CHRISTIAN KANE, in his individual  :
and official capacity               :
        and               :
                                    P/O ALEXANDER HERNANDEZ, in      :
his individual and official capacity    :
        and               :
CITY OF PHILADELPHIA       :
        and               :
TAHIR ELLISON             :
        and               :
JOHN DOES NOS. 1-10        :

**PLAINTIFF JOSHUA OTERO'S RESPONSE TO DEFENDANTS CITY OF PHILADELPHIA, OFFICER CHRISTIAN KANE, AND OFFICER ALEXANDER HERNANDEZ'S STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT**

1.    Admitted.

2.    Admitted.

3.    Admitted.

4.    Admitted. By way of further response, Plaintiff's accident reconstruction expert Mr. David Plant, P.E., later determined that Officers Christian Kane and Alexander Hernandez were traveling between 53 and 55 miles per hour while pursuing Codefendant Mr. Tahir Ellison along East Allegheny Avenue immediately before the collision that resulted in Ms. Virgen Martinez's death, in excess of the 30 mile per

hour speed limit. *See* Expert Report of David P. Plant, dated March 15, 2024, at 6, attached hereto as Exhibit S.

5.      Admitted.

6.      Admitted.

7.      Admitted.

8.      Admitted.

9.      Admitted.

10.     Admitted.

**Facts Relating to the Underlying Incident**

11.     Admitted.

12.     Denied. The events underlying this case took place on November 19, 2020. Both officers graduated from the Philadelphia Police Academy on December 18, 2017. They had therefore both been officers for more than two years as of the time of this incident. *See* Philadelphia Police Academy Grade Sheets, collectively attached hereto as Exhibit T.

13.     Admitted.

14.     Admitted in so far as Defendants produced an expert report that opines on the speeds and relative distances between the two vehicles.  Denied in so far as these conclusions contradict those of Plaintiff's accident reconstruction expert, Mr. David Plant. *See generally* Exh. Q. However, notably Defendants' own accident reconstruction expert concedes that Officers Kane and Hernandez were traveling in excess of the 30 mile per hour speed limits on both Jasper Street and Allegheny Avenue.

15.     Admitted.

16.    Admitted. By way of further response, this was a priority call but not an emergency

call. *See* Exhibit D, Deposition Transcript of Christian Kane, dated April, 24, 2023, at

23:18-23:24.

17.    Denied in so far as Officer Kane was estimating that he and Officer Hernandez were a

little over a mile away. *See id.* at 16:3-16:7.

18.    Admitted.

19.    Admitted.

20.    Admitted.

21.    Admitted in so far as these are the responsibilities of a recorder on certain occasions.

Denied in so far as this implies these responsibilities are solely and only ever the role

of the recorder or that this statement implies that this is the sum of the recorder's

responsibilities while on vehicular patrol.

22.    Denied in so far as officers are responsible for alerting one another when their actions

are violative of police directives. *See* Exhibit H, Expert Report of Dr. Christopher

Chapman, Ph.D., dated October 18, 2023

23.    Admitted. By way of further response, while on patrol, Philadelphia Police

Department [hereinafter "PPD"] partners make joint strategic decisions and jointly

determine their courses of action. *See id.* at 16.

24.    Admitted. By way of further response, Officer Hernandez specifically testified that he

and Mr. Ellison made eye contact when Mr. Ellison looked in his driver side mirror

before he began driving away. *See* Exhibit G, Deposition Transcript of Alexander

Hernandez, dated April, 25, 2023, at 29:18-29:24.

25.     Admitted in so far as no surveillance footage was ever obtained by the PPD. Denied

in so far as it is unknown whether there are surveillance cameras in the area where

this interaction took place.

26.     Admitted.

27.     Admitted. By way of further response, Officer Kane immediately switched on the

RPC's lights upon beginning his pursuit of Mr. Ellison and his immediate intention

was to pull Mr. Ellison over. *See* Exh. D, Dep. Trans. of Christian Kane, at 31:15-

31:23.

28.     Admitted. By way of further response, at this point Mr. Ellison was also prevented

from traveling through the intersection due to vehicles immediately in front of him.

*See* Exhibit K, Homicide Investigation Compilation Video, at time stamps 00:37-

00:49.

29.     Admitted in so far as the officers ran the license plate on Defendant Ellison's vehicle

using the RPC's MDT, the in-vehicle computer system, and that the search results

showed that there were no warrants associated with the vehicle and the vehicle was

not reported stolen. Denied in so far as it was registered to Emani Sonia Purcell. *See*

Exhibit U, MDT Report, dated November 19, 2020, at CITY000797.

30.     Admitted that the Officers were behind Defendant Ellison at the intersection of

Clearfield Street and Frankford Avenue with their emergency lights on while Mr.

Ellison's vehicle was stopped as he waited at the intersection for the vehicles

immediately in front of him that were preventing him from crossing the intersection

to pass. Denied in so far as this statement implies that the officers were pulled over in

any fashion. *See* Exh. K at 00:24 – 00:55.

31.    Denied as stated. Officer Kane testified that he turned his lights on immediately upon beginning to pursue Mr. Ellison, before reaching the intersection of Clearfield Street and Frankford Avenue. *See* Exh. D at 31:15-31:23.

32.    Denied as stated. Officer Kane testified that he hit the siren, however, he was not certain how many times he hit the siren while traveling along Clearfield Street, and the homicide investigation compilation video does not contain audio. *See id.* at 34:1-36:17.

33.    Denied as stated. Mr. Ellison remained stopped at the intersection of Clearfield Street and Frankford Avenue after the light turned green because there was another vehicle immediately in front of him that stopped his from driving forward. *See* Exh. K at 00:24 – 00:55.

34.    Denied as to what Officer Kane may or may not have believed after Mr. Ellison had already exhibited multiple forms of evasive behavior, including initially driving away upon seeing police and making eye contact with Officer Hernandez.

35.    Admitted that Mr. Ellison continued driving and drove through the intersection of Clearfield and Emerald Streets contrary to the red light governing his direction of travel. *See id.* at 01:04 – 01:34.

36.    Admitted that the Officers pursued Mr. Ellison through the intersection of Clearfield and Emerald Streets contrary to the red light governing his direction of travel. *Id.*

37.    Admitted in so far as the officers both testified that they did not recall Mr. Ellison traveling through the intersection contrary to the red light or pursuing him through the intersection contrary to the red light. Denied as to whether these statements are

credible given police officers are trained to observe, and be aware of, their

surroundings, including traffic signs and signals. *See* Exh. D at 75:3-75:14.

38.    Admitted.

39.    Admitted.

40.    Admitted in so far as the officers both testified that they only came to believe that Mr.

Ellison was not intending to stop for them once he turned the wrong way onto Jasper

Street, a one-way street. Denied as to whether these statements are credible given

they had now pursued Mr. Ellison with their lights and sirens on, over the course of

multiple blocks, past a number of possible streetside parking spaces, including

through a four-way intersection contrary to a red light signal, after Mr. Ellison

initially started his car and began driving away from police immediately after making

eye contact with Officer Hernandez while he was wearing full police uniform.

41.    Admitted. By way of further response, Officer Kane repeatedly testified that

throughout his and Officer Hernandez's pursuit of Mr. Ellison, it was not an

emergency that required him to make split second decisions, including while traveling

along Clearfield Street and Jasper Street. *See, e.g.*, Exh. D at 23:1-24:4; 31:15-32:9;

55:21-56:8; 61:1-62:7; 78:17-82:13.

42.    Admitted.

43.    Admitted in so far as Officer Kane testified that he had one to two seconds to make

the decision to turn onto Jasper Street. Denied to whether this is credible given the

fact that this was a non-emergency, non-dangerous narcotics offense and given Mr.

Ellison's rate of speed.

44.     Denied as stated. Per the time stamps of the collected surveillance videos, the pursuit
        lasted between ninety seconds and two minutes overall. *See* Exh. K at 0:37-3:58.

45.     Admitted as to this limited testimony. By way of further response, Officer Hernandez
        testified that this was not an emergency, he was not forced to make split-second
        decisions, and that he had time to thoughtfully and deliberately consider his actions,
        including focusing on Mr. Ellison in case he determined that he needed to pursue him
        on foot. *See* Exh. G, Dep. Trans. of Alexander Hernandez, at 44:8-45:19.

46.     Admitted as to the contents of the radio call made by Officer Hernandez. Denied in so
        far as this implies that any of the officers' decisions were based on the MDT
        information when they were already in full pursuit of Mr. Ellison before running the
        license plate and receiving the search results.

47.     Admitted as to contents of the radio call made by Officer Hernandez. By way of
        further response, Officer Hernandez's statement that they were "not lighting it up or
        anything" was an untrue statement since Officer Kane had already activated the
        RPC's lights, and as a result, the PPD Internal Affairs Division initially determined
        that Officer Hernandez made a misleading or false statement over police radio. *See*
        Exhibit C, Internal Affairs Memorandum, at CITY0014. By making this statement,
        Officer Hernandez led his supervisors to believe that he and Officer Kane were not in
        pursuit of Mr. Ellison. *See* Exh. H, Exp. Rpt. of Dr. Christopher Chapman, at 13.

48.     Admitted. By way of further response, "not lighting it up" is common police
        terminology for not activating one's RPC's emergency lights and was also what the
        other officers listening over police radio took Officer Hernandez's transmission to
        mean.

49.     Admitted. For this reason, the PPD Internal Affairs Division initially determined that
        Officer Hernandez made a misleading or false statement over police radio. *See* Exh.
        C, Internal Affairs Mem., at CITY0014.

50.     Admitted that this was Officer Hernandez's testimony. Denied as to whether it is
        credible both due to Officer Hernandez's ability to observe the RPC's lights and the
        fact that in a standard RPC there is a light on the center console between the two
        officers' seats that indicates when the RPC's lights are activated. *See* Exh. D at 121:1-
        121:11; Exh. F at 127:20-129:3.

51.     Admitted that this was Captain Rosario's testimony. By way of further response,
        Captain Rosario also testified that a vehicular pursuit was the kind of radio
        transmission that would ordinarily grab his attention above others, but that this call
        did not capture his attention because of Officer Hernandez's misleading statement
        and calm tone. *See* Exhibit J, Deposition Transcript of Pedro Rosario, dated July 14,
        2023, at 122:9-125:10.

52.     Denied as to "must supervisors," which Plaintiff believes is a typographical error.
        Admitted that shift supervisors Lieutenant Enrique Mella, Sergeant Christopher
        Bloom, and Sergeant Victoria Casale were all primarily responsible for listening to
        police radio per PPD policy. Captain Rosario further testified that although he was
        not a shift supervisor, he also considered listening to radio traffic to be part of his
        responsibilities at the time. *See* Exh. J at 116:5-120:8.

53.     Admitted that this was Officer Hernandez's testimony. Denied as to whether it is
        credible based on Officer Hernandez's ability to see Mr. Ellison's hand from his
        vantage point and distance.

54.    Admitted.

55.    Admitted.

56.    Admitted. By way of further response, while on Allegheny Avenue immediately

before Mr. Ellison disregarded the red light at the intersection of Allegheny and

Frankford Avenues, Mr. Ellison had sped up to speeds of between 58 and 61 miles

per hour, and Officers Kane and Hernandez had likewise sped up to speeds of

between 53 and 55 miles per hour while pursuing Mr. Ellison, all of which were in

excess of the 30 mile per hour speed limit,. *See* Exh. K, Homicide Investigation

Compilation, at time stamps 2:15-3:58; Exh. S, Exp. Rpt. of David P. Plant, at 6.

57.    Denied as stated. Officers Kane and Hernandez were still immediately behind Mr.

Ellison while on Allegheny Avenue, with no vehicles between them, and were

accelerating in order to keep pace with Mr. Ellison as his speed increased. Officers

Kane and Hernandez reached the intersection of Allegheny and Frankford Avenues

just two seconds after Mr. Ellison did. *See* Exh. K at 3:30-3:55.

58.    Admitted. By way of further response, Officers Kane and Hernandez did not slow

down while approaching the intersection of Allegheny and Frankford Avenues until

and only after Mr. Ellison's vehicle collided with Ms. Martinez's vehicle in the

middle of the four-way intersection. *Id.*

59.    Admitted. By way of further response, the front of Mr. Ellison's vehicle t-boned the

driver's side of Ms. Martinez's vehicle, in a direct perpendicular collision. *Id.*

60.    Admitted.

61.    Admitted.

62.      Admitted. By way of further response, this discrepancy may in part stem from the duration of the radio transmission.

63.      Admitted that Mr. Ellison exited his vehicle. Denied in so far as it is known whether his intention was to flee at this time. During his deposition, Defendant Ellison testified that he got out of his vehicle to get medical attention due to the fact that he broke his femur in the accident. *See* Exhibit V, Deposition Transcript of Tahir Ellison, dated May 24, 2023, at 46:12-47:23.

64.      Admitted.

**Virgen Martinez**

65.      Admitted.

66.      Admitted.

67.      Admitted.

68.      Admitted.

69.      Admitted. By way of further response, Ms. Martinez was pronounced dead after she was observed to still be breathing while pinned in her vehicle by multiple PPD officers, who failed to successfully extract her from her vehicle before she died, including Officer Hernandez. *See* Exhibit W, Bodyworn Camera Footage of Officer Stephen Vivarina, at time stamps 6:56-9:28.

70.      Admitted. By way of further response, Plaintiff's pathology expert Dr. Wayne Ross opined that Ms. Martinez experienced approximately one to six minutes of conscious pain and suffering immediately before her death. *See* Exhibit X, Expert Report of Dr. Wayne Ross, M.D., dated October 16, 2023, at 5-6.

71.      Admitted.

**Defendant Tahir Ellison**

72.    Admitted that this was Mr. Ellison's testimony.

73.    Admitted that this was Mr. Ellison's testimony. The characterization of its meaning is denied in so far as this testimony is ambiguous and subject to multiple interpretations. Mr. Ellison may have simply been refusing to admit to a criminal narcotics offense in response to questions asked by an attorney representing the PPD.

74.    Admitted that this was Mr. Ellison's testimony.

75.    Admitted that this was Mr. Ellison's testimony. Denied in so far as the video surveillance shows that Mr. Ellison did not attempt to pull over at any time while on Clearfield Street. *See* Exh. K at 0:15-1:52.

76.    Admitted that this was Mr. Ellison's testimony. By way of further response, Mr. Ellison repeatedly testified that he drove away Officers Kane and Hernandez initially, and drove in the manner that he did throughout these events, in order to evade the police that were pursuing him. *See* Exh. V at 35:21-37:13, 81:6-84:9, 87:20-88:2.

77.    Admitted that this was Mr. Ellison's testimony.

78.    Admitted that this was Mr. Ellison's testimony.

79.    Admitted.

80.    Admitted.

81.    Admitted.

**Post Accident Investigation of Officer Kane and Hernandez**

82.    Admitted. By way of further response, Officers Kane and Hernandez were removed from street duty because they were found through an independent PPD Internal Affairs investigation to have had violated multiple PPD directives, including the

Directive on vehicular pursuits, the directive prohibiting providing false and misleading information over police radio, the directive prohibiting providing false statements to supervisors, and the directive that requires PPD officers equipped with bodyworn cameras to activate said cameras while responding to assignments. *See generally* Exh. D, Internal Affairs Mem.

83. Admitted. By way of further response, Officers Kane and Hernandez received full pay while they were assigned to office duty. *See* Exh. D, Dep. Trans. of Christian Kane, at 177:5-177:15; Exh. F, Dep. Trans. of Alexander Hernandez, at 118:20-119:15.

84. Admitted.

85. Admitted.

86. Admitted that both Officers were found to have violated Directive 9.4. By way of further response, neither officer contested this violation through PPD's internal proceedings in which they were represented by counsel because they admitted that they violated Directive 9.4. *See* Exh. C at CITY0014-15; Exh. D at 97:7-97:19; Exh. G at 89:11-89:18, 116:1-118:10.

87. Admitted that both Officers were found to have violated the directive requiring them to wear bodyworn cameras. By way of further response, neither officer contested this violation through PPD's internal proceedings in which they were represented by counsel because they admitted that they violated the directive. *Id.*

88. Admitted. By way of further response, Officer Hernandez was found to have made misleading statements both when he communicated over radio that they "were not lighting it up" and when he additionally told his supervisors Lieutenant Mella and

Seargent Bloom on scene after the collision that his and Officer Kane's lights were not active, stating "no lights." *See* Exh. C at CITY0014-15, Statement of Enrique Mella, at CITY0028-30, Statement of Christopher Bloom, at CITY0037-39.

89.    It is admitted that Officer Hernandez pled not guilty to the two charges of providing a false or misleading statement over police radio and a false statement to a supervisor before the Police Board of Inquiry. *See* Exhibit W, CITY OF PHILA. POLICE DEP'T BD. OF INQUIRY, *Statement of Charges and Actions to be Taken*, at CITY 003523, attached hereto as Exhibit Y. Denied in so far as these proceedings appear to still be ongoing based on the fact that there is no written documentation stating that Officer Hernandez was found not to have committed these violations, which Plaintiff specifically requested during discovery, and Officer Hernandez testified that he had still not received any discipline with regard to any of the violations stemming from these events because the proceedings were still ongoing. *See* Exh. G at 121:5-122:13.

90.    It is admitted that Officer Kane sat through a formal counseling session with a supervisor in which they re-read Directive 9.4. It is denied that Officer Hernandez underwent a session like this as Officer Hernandez testified that he had still not had a counseling session on Directive 9.4, did not attend Officer Kane's counseling session, and that he simply re-read the Directive of his own volition. *See* Exh. G at 120:9-123:17.

91.    Admitted.

92.    It is admitted that the officers both testified that this was their belief at the time.

93.    Admitted.

94.    Admitted.

**Philadelphia Police Department's Policies and Training Regarding Police Pursuits**

95.    Admitted.

96.    Admitted.

97.    Admitted.

98.    Denied as stated. Classes are provided to all trainees in the Academy on Motor Vehicle Code and Operation of Emergency Vehicle Operations that cover a wide range of topics, including Directive 9.4.

99.    Admitted.

100.   Admitted. By way of further response, the Operation of Emergency Vehicle Operations class contains a specific slide within the PowerPoint shown and materials provided to trainees. There is one specific session that covers pursuits during the Academy and then just four of the 164 slides shown in the PowerPoint in the EVOC class pertain to the justifiability of a pursuit. *See generally* Exhibit P, Training PowerPoints.

101.   Admitted. By way of further response, the Operation of Emergency Vehicle Operations four-hour presentation covers a range of topics, not just vehicular pursuits.

102.   Admitted that trainees undergo training on a simulator that recreates a vehicular pursuit. Denied in so far as this does not constitute substantive training around the justifications for initiating a pursuit because the training only pertains to how to conduct a pursuit, not whether to instigate a pursuit, as the trainees are instructed that the pursuit is justified for purposes of the simulation. *See* Exhibit O, Deposition Transcript of Corporate Designee, Sheila Young, dated July 13, 2023, at 53:21-56:8.

103.    Admitted that training on all manner of operation of emergency vehicles and the Motor Vehicle Code totals 80 hours.

104.    Admitted that officers are tested on whether they know the written language of the pursuit via a written testing while at the Academy.

105.    Admitted that officers are supposed to attend reactive training upon violating Directive 9.4 per PPD policy. By way of further response, neither Officer Kane nor Officer Hernandez underwent this subsequent reactive training following this incident. See Exh. D at 104:3-104:13; Exh. O at 98:9-104:4.

106.    Admitted.

107.    It is admitted that the districts are instructed to send up to two officers to monthly proactive trainings. However, it is denied in so far as the district supervisors select which officers are sent, typically prioritizing officers who have already gotten into accidents, and if a supervisor determines that no officers are available, they are not required to send any officers to these proactive trainings. Exh. O at 72:24-73:5, 79:7-79:14, 96:6-96:15.

108.    Admitted.

109.    It is admitted that neither Officer Kane nor Officer Hernandez ever underwent proactive training before this incident or reactive training afterwards, despite the PPD policy that they should undergo reactive training following their violation of Directive 9.4. It is denied that less than two years elapsed between when Officer Kane and Officer Hernandez graduated from the Academy in December of 2017 and this event in November of 2020.

110. Denied as stated. Captain Rosario testified that supervisors may choose to discuss pursuits during roll call, which lasts up to fifteen minutes, although this is not mandatory or documented. Exh. J at 60:11-61:11, 74:1-76:23. By way of further response, as Plaintiff's police practices expert Dr. Christopher Chapman explained, brief discussions during roll call are not a sufficient way to make sure that active PPD officers are trained on vehicular pursuits on an ongoing basis. *See* Exh. H, Exp. Rpt. of Dr. Christopher Chapman, at 31-32.

111. It is admitted that Plaintiff produced an expert report and supplemental expert report by police practices expert Dr. Christopher Chapman that explains numerous ways in which Defendants' conduct did not adhere to applicable standards within the field and in particular that PPD's training program on vehicular pursuits was inadequate. *See generally* Exh. H; Exhibit I, Expert Report of Dr. Christopher Chapman, Ph.D., dated March 6, 2024.

112. It is admitted that Defendants produced an expert report by Mr. Robert Pusin that disputed Dr. Chapman's conclusions.

## SUPPLEMENTAL FACTS

113. The area in which this Incident took place is a populous area in the Kensington neighborhood of Philadelphia that both Officers Kane and Hernandez knew well from their tenure in the 24th District. The route passed numerous schools, churches, and stores, and typically had heavy vehicular and pedestrian traffic. *See* Exh. D at 111:17-113:11; Exh. G at 42:16-43:2.

114. The speed limit on Jasper Street is 20 miles per hour. *See* Exh. S at 3.

115. The speed limit on Allegheny Avenue is 30 miles per hour. *See* Exh. S at 3.

116.    Officer Kane stated during his deposition that he knew that a pursuit under these circumstances posed a risk of a vehicular accident that could cause serious injury or death. *See* Exh. D at 111:17-113:11.

117.    None of the supervisors responsible for monitoring the radio transmissions that morning, including Lieutenant Enrique Mella, Sergeant Victoria Casale, Sergeant Christopher Bloom, or Captain Rosario Pedro, responded via police radio to Officer Hernandez's transmission stating that he and Officer Kane were not "lighting it up or anything." *See* Exhibit J Deposition Transcript of Pedro Rosario, dated July 14, 2023, at 122:9-125:10; Exhibit L, City of Philadelphia's Responses to Plaintiff's Requests for Admission, dated August 17, 2023; Exhibit M Deposition Transcript of Captain Christopher Bloom, dated August 4, 2023, at 74:19-75:24; 99:5-99:14.

118.    The 24th District of the PPD has had bodyworn cameras since before both Officer Kane and Officer Hernandez graduated from the Police Academy. *See* Exh. G, Dep. Trans. of Alexander Hernandez at 85:23-86:7.

119.    Assigned PPD patrol partners swap between acting as the driver and the recorder on a day-to-day basis. *See id.* at 22:10-22:22.

120.    There are no accompanying training materials that are provided to police trainees during their training at the Academy that expand upon or clarify any of the terms contained within PPD Directive 9.4. *See* Exh. O, Dep. Trans. of Corporate Designee, Sheila Young at 56:19-57:10, 60:4-60:20, 66:16-67:14.

121.    Captain Rosario, the commanding officer of the 24th District at the time of these events, testified that he believed that Directive 9.4 was vague and does not provide

adequate guidance to officers and testified that he has held this opinion since his becoming a supervisor in 2005. *See* Exh. J at 40:1-40:5, 55:7-55:10, 56:3-56:7.

122.    The district supervisors select which officers are sent to proactive trainings on vehicular pursuits, and typically prioritize officers who have already gotten into accidents. Exh. J at 72:24-73:5, 79:7-79:14; Exh. O at 80:8-81:4; 83:4-84:23.

123.    If a supervisor determines that no officers are available, they are not required to send any officers to these proactive trainings. Exh. O at 96:6-96:15.

124.    A District also cannot choose to send more than two officers to a given proactive training. *Id.* at 81:22-82:9.

125.    There was a period of time when there were no proactive or reactive trainings for active duty officers around vehicular pursuits due to the COVID-19 pandemic. *Id.* at 87:16-88:6, 92:3-93:10.

126.    The City historically provided training for officers when they became supervisors around supervising pursuits, but these supervisor trainings have not taken place at all since the pandemic. *Id.* at 67:22-68:18. *See also* Exh. M, Dep. Trans. of Captain Christopher Bloom, at 52:5-52:18, 57:24-58:23

127.    The City compiled PPD pursuit memoranda, which officers were required to prepare after being involved in a completed vehicular pursuit, and the data gleaned from these pursuit memoranda has shown that between 2015 and 2020, vehicular pursuits resulted in injury or death to 36 civilians, 34 suspects, and 11 PPD police officers. *See* Exhibit R, PPD Statistics.

128.    According to the City's data, from 2015 to 2019, there were 208 unjustified pursuits out of total of 354 pursuits, which is 58.7%. *See id.*