## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOSHUA OTERO, as Administrator     :
of the Estate of Virgen Martinez,     :
Deceased     :
                     :     NO. 22-4141
      v.             :
                     :
OFFICER CHRISTIAN KANE, et al.     :

# O P I N I O N

SCOTT W. REID                       DATE:  September 12, 2024
UNITED STATES MAGISTRATE JUDGE

In this action, Joshua Otero, as Administrator for the estate of his mother, Virgen

Martinez, has sued Police Officers Christian Kane and Alexander Hernandez in their individual

and official capacities ("the Police Defendants"), Tahir Ellison, the City of Philadelphia ("the

City"), and John Doe defendants, for the death of Ms. Martinez in a car collision with Tahir

Ellison, who was fleeing from the Police Defendants.

Otero has asserted a claim against the Police Defendants and the City under 42 U.S.C. §

1983 for violating Ms. Martinez's right to substantive due process under a state-created danger

theory; a *Monell* claim against the City under 42 U.S.C. § 1983 for failure to train and supervise;

and state law negligence claims against all defendants.

The Police Defendants and the City ("Defendants") have filed a motion for partial

summary judgment under Federal Rule of Civil Procedure 56(c).  For the reasons set forth

below, Defendants' motion will be granted in part, and denied in part.

I.      *Factual Background[1]*

A.      *The Collision*

On November 19, 2020, at 8:20 a.m., the Philadelphia Police Department received a call reporting that individuals were giving out free samples of narcotics at the intersection of East Clearfield Street and Martha Street, in Philadelphia. *Police Defendants' and the City's Statement of Undisputed Material Facts in Support of Motion for Summary Judgment ("DSUMF")* at ¶15. This location is in Kensington, a populous neighborhood in Philadelphia. *Plaintiff's Statement of Undisputed Material Facts* ("PSUMF") at ¶113.

The police dispatcher reached out to Defendants, Officers Kane and Hernandez to respond to this call. *DSUMF* at ¶16. On that morning, officers Kane and Hernandez, both of whom graduated from the Philadelphia Police Academy nearly three years earlier, in December, 2017, were in a marked police car, wearing police uniforms. *Id*. at ¶19, *PSUMF* at ¶19. Officer Kane drove the police car, and Officer Hernandez sat in the front passenger seat. *DSUMF* at ¶20. The Officers were of equal rank. *Id*. at ¶22.

Officers Kane and Hernandez drove to Clearfield and Martha Streets, where they saw "a large crowd gathered around this vehicle, someone handing out small objects." *Deposition Transcript of Alexander Hernandez*, Attached to Motion as Exhibit G, at 26:4-18. Officer Hernandez got out of the police car and approached the crowd. *DSUMF* at ¶24. The individual in the vehicle, who turned out to be Defendant Tahir Ellison, made eye contact with Officer Hernandez in the rear-view mirror, and then began to drive away, west on Clearfield Street. *Id*. at ¶¶24 and 28. There is no allegation that Ellison was then driving at an excessive rate of speed.

---

[1] Where there is a dispute, facts are construed in favor of Otero, as the non-moving party, except where both parties' versions are set forth.

Officer Hernandez returned to the police car.  Officer Kane switched on the police car lights, turned the car around, and drove behind Ellison's car.  *Id*. at ¶¶24 and 27; *PSUMF* at ¶27.  Again, there is no allegation that the police officers were then moving at an excessive rate of speed.  Officer Kane testified at his deposition that his intention at that point was to pull Ellison over.  *Deposition Transcript of Christian Kane*, attached to Motion as Exhibit C at 31:15-31:23.  At 8:33:23 a.m., Officer Hernandez ran the license plate number of the car Ellison was driving through the police car's computer system, determining that there were no warrants associated with the car, and that it had not been reported as stolen.  *DSUMF* at ¶29 and Exhibit G at 36:8-37:15.

Street video submitted as evidence shows Ellison stopped at a red light at the intersection of Clearfield Street and Frankford Avenue, with the police car behind him, emergency lights on.  *DSUMF* at ¶30.  According to Officer Kane, he "hit" the car siren "a couple of times" at this point, however, he later testified that he was not sure how many times he hit the siren as the cars proceeded down Clearfield Street.   *Id*. at ¶32; Exhibit C, at 34:1-36:17.

After the light changed, Ellison continued driving west on Clearfield Street at a moderate rate of speed.  *DSUMF* at ¶34.  However, Ellison continued through a red light at the intersection of Clearfield and Emerald Streets.  *Id*. at ¶35.  The police car also drove through the red light at Clearfield and Emerald Streets.  *Id*. at ¶36.

At the next intersection after Clearfield and Emerald Streets, Ellison turned the wrong way down Jasper Street, a small one-way street.  *Id*. at ¶39.  Officers Kane and Hernandez followed Ellison.  *Id*. at ¶46.  At 8:33:35 a.m., Officer Hernandez announced on police radio that Ellison "took off on us" and was going the wrong way on Jasper Street, toward Allegheny Avenue.  *Id*.  The police officer monitoring the radio asked:  "Are you following?" to which

Officer Hernandez replied in the affirmative, adding "From where we can see it from, but we are not lighting it up or anything." *Id*. at ¶47. The parties agree that "not lighting it up" meant that the police car lights were not activated. *Id*. at ¶48 and *PSUMF* at ¶49.

When Officer Hernandez called in to the police station on his radio to report that he and Officer Kane were pursuing Ellison, Sergeant Christopher Bloom, Sergeant Casale, and Lt. Mella, were assigned to monitor radio traffic. *City's Answers to Plaintiff's Request for Admissions*, attached as Exhibit L to Plaintiff's Response, at Request No. 1. None of them acknowledged Officer Hernandez's transmission, asked further questions, approved, or terminated the pursuit. *Id*. at Request 3.

Captain Pedro Rosario, the Commanding Officer in the 24th Police District at the time of the events relevant to this case testified at his deposition that he, too, was monitoring the radio in his capacity as a commanding officer. *Deposition of Pedro Rosario*, attached to Motion as Exhibit T at 122:9-125:5. He also testified that, if he had heard Officer Hernandez's transmission and failed to "intercede," he would have been negligent. *Id*. at 122:9-24. Sergeant Bloom also testified that the pursuit should have been terminated. *Deposition of Christopher Bloom*, attached as Exhibit M to Plaintiff's Response, at 103:8-17.

When Ellison reached Allegheny Avenue, he turned east, and again passed the intersection at Emerald Street. *DSUMF* at ¶55. At that point, Ellison had sped up to between 58 and 61 miles per hour, where the speed limit was 30 miles per hour, and the police car similarly sped up to between 53 and 55 miles per hour. *PSUMF* at ¶ 56.

The next intersection was Allegheny Avenue and Frankford Avenue; Ellison drove through a red light without slowing and struck the passenger's side of a car driven by Virgen Martinez in the middle of the intersection. *DSUMF* at ¶58.

The police car went through the intersection and then stopped at the scene of the accident. *Id.* at ¶60.  Officer Hernandez radioed that there had been a motor vehicle accident.  *Id.* at 61. Thirty-nine seconds passed between Officer Hernandez radioing that Ellison "took off on" them, and him radioing that the accident occurred.  *Id.* at ¶62.

B.      *Ms. Martinez*

Virgen Martinez was pronounced dead at the scene of the accident at 8:50 a.m. *Plaintiff's Expert Report of Wayne Ross, M.D.*, attached to Motion as Exhibit X at page 2. However, she had earlier been observed to have been breathing, while multiple police officers unsuccessfully attempted to free her from her car.  *PSUMF* at ¶69.  Plaintiff's expert witness, Dr. Wayne Ross, opined that Ms. Martinez experienced approximately one to six minutes of conscious pain and suffering.  *Opinion of Wayne K. Ross, M.D., P.C.*, attached to Motion as Exhibit M at 5-6.

At the time of her death, Ms. Martinez was 47 years old, and the mother of four children, including Plaintiff Joshua Otero.  *Deposition Transcript of Joshua Otero*, attached to Motion as Exhibit L at 56:6-9.  She was employed on a production line, boxing specialized bags used by contractors.  *Id.* at 60:2-5.

C.      *Defendant Tahir Ellison*

Defendant Tahir Ellison pled guilty to third-degree murder, aggravated assault, and driving under the influence of a controlled substance, in connection with the motor vehicle accident in which Ms. Martinez died.  *Guilty Plea Transcript*, *Commonwealth v. Ellison*, attached to Motion as Exhibit P.  Additionally, sixteen packets containing fentanyl were recovered from the car he was driving.  *Property Receipt* and *Chemistry Unit Lab Report*, attached to Motion as Exhibit O.

At his deposition in this case, Ellison was evasive when asked about his activities on Martha Street on the morning of the accident. *Deposition Transcript of Tahir Ellison*, attached to Motion as Exhibit N at 32:23-33:4. However, he testified that he first noticed the police car behind him at Clearfield Street and Frankford Avenue, and when it did not pass him, he believed the police car was pursuing him. *Id*. at 35:30-36:8.

  D.  *Police Investigation and Discipline of Officers Kane and Hernandez*

As a result of the events described above, Officer Hernandez was taken off of street duty and assigned to office duty for two years. Exhibit G (*Deposition of Officer Hernandez*) at 119:19-22. Officer Kane was also taken off street duty, for just under a year. Exhibit C (*Deposition of Officer Kane*) at 176:13-14. While on office duty, both Officers received full pay, but their weapon permits were revoked, and they were not allowed to make arrests. Defendants' Exhibit C (*Deposition of Officer Kane*) at 117:5-15; Defendants' Exhibit G (*Deposition of Officer Hernandez*) at 123:3-6, 118:20-119:15.

A police department internal investigation concluded that both officers violated Directive 9.4 which establishes the parameters for police pursuits. *Directive 9.4*, attached to Motion as Exhibit R; *IAD Memorandum and Findings*, attached to Motion as Exhibit Q page CITY0014. Neither officer contested this finding. *PSUMF* at ¶86. Both officers were also found to have violated Philadelphia Police Department Directives requiring them to wear body-worn cameras. *Id*. at ¶87. Neither officer contested this finding. *Id*.

Officer Hernandez was found to have violated the Philadelphia Police Department Directives for providing false information, both for having said over the radio that they "were not lighting it up," and when he told his supervisors, at the scene of the collision, that their lights were not on. *Id*. at ¶88. Officer Hernandez pled not guilty to those findings, and he testified at

his deposition that he was ultimately found not guilty.  Defendants' Exhibit G (*Deposition of Officer Hernandez*) at 121:5-122:13.  However, as of the time he responded to this Motion, Plaintiff had received no written documentation of any "not guilty" finding.  *PSUMF* at ¶89.

  E. *Philadelphia Police Department Policies and Training on Pursuit*

  Philadelphia Police Department Directive 9.4, which was last updated on April 29, 2016, defines vehicular pursuit as "use of a motor vehicle to chase, follow, or go after a vehicle that has refused to stop."  Exhibit R.  Directive 9.4 sets forth the official policy on vehicular pursuits.  It provides:

> A vehicle pursuit is only permitted if the pursuit is necessary to effect the arrest or prevent escape, and the officer has probable cause to believe that a person being pursued has committed or attempted a forcible felony, or the officer has probable cause to believe that the person being pursued possesses a deadly weapon other than the vehicle itself.

*Id*.  A "forcible felony" is defined as one involving actual or threatened serious injury, including murder, manslaughter, arson involving persons, aggravated assault, and sometimes sexual crimes, robbery and kidnapping.  *Id*. at *Directive 9.4-2*.

  Thus, according to Directive 9.4, pursuit is justified only if it is (a) "necessary to prevent the death or serious bodily injury of another person," (b) to stop a suspect who attempted a forcible felony, or (c) to stop a suspect who possesses a deadly weapon.  *Id*.  Captain Rosario testified in his deposition that he believed that Directive 9.4 was vague and does not provide adequate guidance to officers.  Exhibit T (*Deposition of Pedro Rosario*) at 40:1-40:5, 55:7-56:7.

  Every police recruit learns about Directive 9.4 in a two-hour Police Academy session about vehicular pursuits, and a four-hour class about Emergency Vehicle Operations ("EVO"), although the EVO class also covers topics other than pursuit.  *Deposition of Corporal Sheila Young*, attached to Motion as Exhibit S at 29:21-30:3.  Recruits also use a driving simulator presenting pursuit scenarios, during which Directive 9.4 is mentioned, although the focus is on

conducting a pursuit, rather than deciding when to instigate a pursuit.  *Id*. at 53:10-56:8.  Recruits must pass a test on pursuit to graduate from the Police Academy.  *Id*. 13:17-24.

The Philadelphia Police Department policy requires an officer who violates Directive 9.4 to attend a reactive class on pursuits.  *Id*. at 80:8-24, 81:1-4.  However, as of the time of their depositions, neither Officer Kane nor Officer Hernandez had undergone this reactive training following Ms. Martinez's death.  Exhibit S at 98:9-104:4.

Proactive classes on pursuit are conducted once monthly, and each police district is required to send two officers.  Exhibit S at 80:8-24 and 81:1-4.  Proactive and reactive trainings on vehicular pursuits were not conducted for a period of time during the COVID pandemic.  Exhibit S at 87:16-88:6, 92:3-93:10.  Nor were new supervisors trained on supervising vehicular pursuits during the pandemic, and such trainings had not resumed as of the time Captain Christopher Bloom was deposed.  *Deposition of Lt. Christopher Bloom*, attached to Plaintiff's Response as Exhibit M at 52:5-18.

Corporal Rosario testified that supervisors may discuss pursuits during roll call, which lasts no more than fifteen minutes, but this is not mandatory, and is not documented.  Exhibit T at 60:11-61:11, 741-76:23.

Dr. Christopher Chapman, Plaintiff's expert on police practices, opined in his report that the Philadelphia Police Department's training program on vehicular pursuits was inadequate.  *Expert Report of Christopher Chapman, Ph.D.* of March 6, 2024, attached to Motion as Exhibit K.  Robert Pusins, Defendants' expert witness, however, has opined that the training Officers Kane and Hernandez received was "well within reasonable law enforcement training standards regarding pursuits and consistent with widely accepted police practices regarding pursuit training."  *Expert Report of Robert Pusins*, attached to Motion as Exhibit U.

8

According to data compiled by the City, there were 354 police vehicular pursuits between 2015 and 2019, of which, 208 (58.7%) were unjustified.  *PDD Statistics*, attached to Response as Exhibit R.  Between 2015 and 2020, vehicular pursuits resulted in injury or death to 36 civilians, 34 suspects, and 11 Philadelphia police officers.  *Id*.

II.     *Standard for Summary Judgment*

Summary judgment is warranted where the pleadings and discovery, as well as any affidavits, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pr. 56.  The moving party has the burden of demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In response, the non-moving party must present more than mere bare assertions, conclusory allegations, or suspicions to show the existence of a genuine issue. *Jutrowski Township of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018).  It is not sufficient to reassert factually unsupported allegations contained in the pleadings.  *Anderson v. Liberty Lobby*, 466 U.S. 242, 249 (1986*); Celotex*, *supra*, at 325.

When ruling on a summary judgment motion, the court must construe the evidence and any reasonable inferences drawn from it in favor of the non-moving party.  *Anderson v. Liberty Lobby*, *supra* at 255; *Tiggs Corp. v. Dow Corning Corp*., 822 F.2d 358, 361 (3d Cir. 1987). Nevertheless, Rule 56 "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, *supra*, at 323.

III.     *Discussion*

A.     *The State-Created Danger Claim*

Defendants' first, and most complex claim, is that Otero cannot prove his Fourteenth

Amendment claim against the Police Defendants and the City because high speed police chases

of fleeing suspects are only unconstitutional when the officer has an intent to harm.  After much

consideration of the controlling cases from the United States Supreme Court and the Court of

Appeals for the Third Circuit, and the relevant opinions authored by other judges in this Court, I

conclude, however, that Defendants' interpretation of the law is incorrect.

As explained below, I will deny Defendants' motion with regard to this claim and permit

Plaintiff to proceed on a theory that Defendants acted with conscious disregard of a substantial

risk of harm to Ms. Martinez.

1.     *Legal Principles Relevant to Otero's Substantive Due Process Claim*

a.     *The State-Created Danger Theory*

As the Court of Appeals for the Third Circuit has explained:

Section 1983 imposes civil liability upon any person who, acting under the color of state
law, deprives another individual of any rights, privileges, or immunities secured by the
Constitution or the laws of the United States.  This section does not create any new
substantive rights but instead provides a remedy for the violation of a federal
constitutional or statutory right.

*Gruenke v. Seip*, 225 F.3d 290, 298 (3d Cir. 2000), *citing Baker v. Collan*, 443 U.S. 137, 144 at

n. 3 (1979).

To state a claim under §1983, a plaintiff must show that the defendant (a) deprived her of

a federal constitutional or statutory right (b) while acting under the color of state law.  *Id*., *citing*

*Parratt v. Taylor*, 451 U.S. 527 353 (1981), *overruled on other grounds*, *Daniels v. Williams*,

474 U.S. 327 (1986).

As to the first element,[2] the Due Process Clause of the Fourteenth Amendment provides: "No state shall …. Deprive any person of life, liberty, or property, without due process of law." Only that level of government action which shocks the conscience can be considered violative of procedural due process. *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998).

As a general principle, the government has no obligation under the Due Process Clause to protect citizens against injuries caused by private actors. *Haberle v. Troxell*, 885 F.3d 170, 176 (3d Cir. 2018); *citing DeShaney v. Winnebago Cty. Social Svcs. Dep't.*, 489 U.S. 189, 201 (1989) In this case, Ms. Martinez's injuries were directly caused by Ellison, who is serving time for third-degree murder. However, the Court of Appeals for the Third Circuit has recognized that a constitutional violation can occur "when state authority is affirmatively employed in a manner that injures a citizen or renders him 'more vulnerable to injury from another source that he or she would have been in the absence of state intervention.'" *Bright v. Westmoreland County*, 443 F.3d 276, 280 (3d Cir. 2006), *quoting Schieber v. City of Philadelphia*, 320 F.3d 409, 416 (3d Cir. 2003). As the *Bright* court expressed it: "This complement to the *DeShaney* holding has come to be known in its progeny as the 'state-created danger doctrine.'" 443 F.3d at 281.

To prove a state-created danger, the following must be shown:

1. The harm ultimately caused was foreseeable and fairly direct;

2. A state actor acted with a degree of culpability that shocks the conscience;

3. A relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts; and

4. The state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all.

*Bright*, *supra*, at 433 F.3d 281.

---

[2] The Defendants have not raised an issue as to whether the Police Defendants acted in their official capacities.

In this case, the only disputed element is whether the defendants acted with a degree of culpability that shocks the conscience.

    b.  *"Shocks the Conscience": The State-Created Danger in Police Pursuit Cases*

It is obvious that a police pursuit is "inherently risky." *Sauers v. Borough of Nesquehoning*, 905 F.3d 711, 723 (3d Cir. 2018). It creates a danger to other drivers, pedestrians, to the person pursued, and even to the pursuing officers. Nevertheless, there is also a clear public interest in permitting the police to pursue wrongdoers without undue limitation. Consequently, the second factor set forth in *Bright* – the issue of what level of culpability "shocks the conscience" in a police pursuit case – has been much discussed in state-created danger cases.

In *Lewis v. Sacramento*, the United States Supreme Court held that negligence is "categorically beneath the constitutional due process threshold." 523 U.S. 833, 849 (1998). In *Lewis*, a sixteen-year-old boy died when the motorcycle on which he was the rear passenger tipped over after leading the police on a chase at speeds over 100 m.p.h., and the pursuing police car skidded into him. *Id* at 833. The United States Supreme Court refused to permit the parents' procedural due process claim to go forward, stating: "We hold that high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressable by an action under §1983." *Id.* at 854. But *Lewis* left open the possibility that a lower level of culpability may apply in the right circumstances.

Specifically, the *Lewis* court recognized that deliberate indifference could meet the constitutional threshold in some cases, but not where a decision has to be made by the government actor "in haste, under pressure, and frequently without the luxury of a second

chance," such as in a prison riot or high-speed police chase.  *Id*. at 835, quoting *Whitley v. Albers*, 475 U.S. 312, 320 (1986).

Thus, later cases from the Court of Appeals for the Third Circuit see *Lewis* as establishing that "the required degree of culpability varies based on the 'circumstances of each case,' and, in particular, on the time pressure under 'which the government actor had to respond.'"  *Haberle v. Troxell*, *supra*, at 855 F.3d 177, *quoting Phillips v. City of Allegheny*, 515 F.3d 224, 240 (3d Cir. 2008).

Significantly, in 2018, the Court of Appeals for the Third Circuit decided *Sauers v. Borough of Nesquehoning*, *supra*.  In this police pursuit case, the court applied the four-point test for state-created danger from *Bright*, *supra*, and also formalized the principles it earlier set forth in *Haberle* regarding the level of culpability required to "shock the conscience" in a §1983 case:

> (a) Actions taken in a "hyperpressurized environment" require an intent on the part of the police officer to cause harm;

> (b) Actions taken "within a time frame that allows an officer to engage in 'hurried deliberation'" require less than an intent to cause harm – rather, "a conscious disregard of a great risk of serious harm" is sufficient;

> (c) Actions undertaken with time for "unhurried judgments" and "careful deliberation" will shock the conscience with only "deliberate indifference."

905 F.3d at 717-718.

Specifically as to police pursuits, the *Sauers* court explicitly rejected a view of *Lewis* as requiring  "an 'intent to harm' standard for all police pursuit cases, whether or not an emergency existed at the time of the pursuit."  905 F.3d at 721-2.  Instead, it found that a conscious disregard of a great risk of serious harm was sufficient to shock the conscience in the case before it, where a police officer took off at speeds over 100 m.p.h. to catch up with a driver who

committed a minor traffic offense – and did not know he was being pursued – and ended in killing an uninvolved motorist and injuring her husband.  *Id*. at 718.

The *Sauers* court wrote:

Police officers now have fair warning that their conduct when engaged in a high-speed pursuit will be subject to the full body of our state-created danger case law.  That law clearly establishes that **the level of culpability required to shock the conscience exists on a spectrum tied to the amount of time a government official has to act.  In the police pursuit context, it is also necessary to take into consideration the officer's justification for engaging in the pursuit.**  We recognize that most high-speed police pursuits arise when officers are responding to emergencies or when they must make split-second decisions to pursue fleeing suspects.  Our holding today does nothing to alter the longstanding principle that, in such cases, constitutional liability cannot exist absent an intent to harm.  **But when there is no compelling justification for an officer to engage in a high-speed pursuit and an officer has time to consider whether to engage in such inherently risky behavior, constitutional liability can arise when the officer proceeds to operate his vehicle in a manner that demonstrates a conscious disregard of a great risk of serious harm**.

*Id*. at 723.  (Emphasis supplied).

2. *Sauers Does Not Create a Bright-Line Rule Requiring Intent to Harm in Police Pursuit Cases*

It is evident from the above-quoted language that the *Sauers* court did not find that *Lewis* created, and did not itself create, a bright-line rule requiring a plaintiff in a §1983 police pursuit case to show that the officer acted with intent to harm.

Instead, the *Sauers* court plainly stated that, although *most high-speed* police pursuits will be subject to an "intent to harm" standard, the standard to be applied must be considered on the facts of each case, and will depend on (a) the justification for the pursuit; and (b) the amount of time the officer had to decide whether to engage in the pursuit.  905 F.3d at 723.[3]

---

[3] The *Sauers* court nevertheless granted the government defendants qualified immunity, since the law regarding intent in a state-created danger case was unclear until it issued its decision.  905 F.3d at 723.

Defendants argue otherwise, noting that the *Sauers* court wrote "*Lewis*, then, clearly established that an officer can be liable for a substantive due process violation resulting from a high-speed pursuit of a dangerously fleeing suspect only if the officer intended to cause harm." *Id* at 720.  However, this remark preceded the language quoted above.  When the opinion is considered as a whole, it is clear that *Sauers* did not preclude the possibility of a police pursuit which was not high-speed, or a suspect who was not "dangerously fleeing."

I am well aware that no §1983 police pursuit case in this Circuit has been decided under a standard less than intent to harm.  *See Miller v. Wolk*, Civ. A. No. 20-6301, 2021 WL 1604003 (E.D. Pa. Apr. 12, 2024); *Donahue v. Borough of Collingdale*, 22cv1695, 2024 WL 387455 (E.D. Pa. Feb. 1, 2024); *Small v. Lower Paxton Township*, Civ. A. No. 22-1146, 2023 WL 4631575 (M.D. Pa. July 19, 2023), *motion to certify interlocutory appeal den.* 2024 WL 691360 (M.D. Pa. Feb. 20, 2024); *Koreny v. Smith*, Civ. A. No. 17-371, 2018 WL 1141513 (W.D. Pa. Mar. 2, 2018).[4]

Further, some courts have specifically decided that *Lewis* and *Sauers* preclude the application of any standard other than intent to harm in a police pursuit case, except in the unusual case such as *Sauers*, where the pursued driver is not actually fleeing.

In *Koreny v Smith*, a case preceding *Sauers*, the court determined that "intent to harm" applied, even where the plaintiff alleged that the pursuing police officer witnessed only a minor driving irregularity, leading to a high-speed chase which resulted in a collision causing "catastrophic" injuries to the plaintiff, an uninvolved motorist.  The court dismissed the §1983 claim, writing:

---

[4] Nor is it clear whether other circuits have permitted police pursuit claims under a lesser standard than intent to harm.  *See Lindsey v. Hyler*, 918 F.3d 1109, 1112-13 (10th Cir. 2019).  Other circuits, however, are not controlled by *Sauers* and are therefore of limited relevance here.

> *Lewis* did not indicate that in a high-speed pursuit case to meet the "shocks the conscience" standard the degree of culpability would be determined on a case by case basis by clocking the minutes of the pursuit and might at times require only deliberate indifference or reckless disregard on the part of the pursuing officer or others involved in pursuit decision-making; rather, the Court **explicitly laid down a bright line rule**. As such, to defeat the motion to dismiss, Koreny must point to factual allegations sufficient to plausibly show [the police defendants]'s intent to harm.

2018 WL 1141513 at *6. (Emphasis supplied).

By the time *Donahue*, *supra*, was decided in the Eastern District of Pennsylvania, the judge deciding it had the benefit of the *Sauers* opinion, and knew that the degree of culpability that shocks the conscience lay on a spectrum and would, in fact, be determined on a case-by-case basis. 2024 WL 387455 at *3. However, the *Donahue* court nevertheless dismissed a §1983 case seeking to apply the *Sauers* "conscious disregard of great risk" standard, writing:

> When choosing to use the lesser "disregard of great risk" standard, the Third Circuit delineated a two-part test. It applies to a "reckless pursuit of an individual suspected of a summary traffic offense (1) when there is no pending emergency and (2) *when the suspect is not actively fleeing police*. *Sauers*, 905 F.3d at 717 (emphasis added). While there is genuine dispute over whether [the individual pursued]'s flight constituted a pending emergency, there is no doubt that [he], unlike the Dodge in *Sauers*, was refusing to yield to police. But the *Sauers* test is conjunctive and, therefore, inapplicable when, as here, only one prong is met. As such, the well-established principle that an officer needs an intent to harm governs.

*Id*. at *6. (Emphasis in original).

Notably, however, the *Donahue* analysis of *Sauers* is based on a misquotation. The "factors" cited were clearly not from a "two-part test" delineating the "disregard of great risk" standard. Instead, they are from the *Sauers* court's definition of the right at issue in that particular case to determine whether qualified immunity protected the police defendants:

> Defining a right at the appropriate level of specificity is often the most critical aspect of a qualified immunity analysis. In undertaking that task, we are guided by the Supreme Court's repeated instructions to do so in light of the particular facts of the case at hand. … We accordingly define the right at issue here as one not to be injured or killed as a result of a police officer's reckless pursuit of an individual suspected of a summary traffic

16

offense **when there is no pending emergency and when the suspect is not actively fleeing police.**

*Sauers* at 905 F.3d 716-7.  (Bold supplied; internal citations omitted).

One month later, in *Miller v. Wolk*, *supra*, the *Donahue* judge persisted in applying the supposed conjunctive *Sauers* test that the *Sauers* court never created.  2024 WL 1604003 at *9. This, despite recognizing earlier in the opinion that the "factors" were actually part of the *Sauers* court's definition of the right at issue "in light of the particular facts of the case at hand."  *Id*. at *8.

Crucially, *Sauers* indeed created a two-point test for the application of the conscious disregard standard, but it is not the one applied in *Donahue* and *Miller* which mandates an "intent to harm" standard any time there is a fleeing felon.  On the contrary, the *Sauers* court explicitly left open the possibility of a police pursuit claim considered under a conscious disregard standard, provided that (1) there is no compelling justification to engage in a high-speed pursuit, and (2) the officer has time to consider whether to engage in such inherently risky behavior.  905 F.3d at 723.

3.  *The Application of the Relevant Law to the Facts of This Case*

Indisputably, most police pursuits will be addressed under the "intent to harm" standard, because a police officer typically has little time to consider whether to pursue a fleeing suspect. In *Lewis*, for example, the first time the two defendant police officers saw the decedent, he was riding on a motorcycle approaching "at high speed."  523 U.S. at 836.  When one police officer turned on his rotating lights and yelled at the boys to stop, they maneuvered the motorcycle between the two police cars and "sped off."  *Id*.  Clearly, this was a highly pressurized situation, and required a split-second decision as to whether to pursue.

Here, however, Otero has adduced sufficient evidence to create vital issues of fact as to both parts of the *Sauers* two-point test for determining whether conscious disregard is the standard to apply.  As an initial matter, the parties do not agree as to how much time the Police Defendants had to decide whether to pursue Ellison.  Some cases focus only on the high-speed portion of a pursuit, ignoring the rest of the pursuit as irrelevant, but there is no precedent requiring this.  On the contrary, *Sauers* demands consideration of the individualized facts of a case.

To limit the factfinder's view to what is sometimes the last few seconds of a pursuit would be to predetermine that Police Officers *never* have time to consider their actions in a police pursuit.  By that logic, every police pursuit would be "hyperpressurized," thus requiring an intent to harm standard.  This is at odds with *Sauers*, which specifically held that the "shocks the conscience" standard must be determined on a case-by-case basis.  905 F.3d at 723.

It is true that *Sauers* was an exceptional case where a police officer "pursued" a car that was not fleeing.  However, that does not mean that a split-second decision is automatically assumed whenever there is a fleeing suspect.  It is simply unrealistic to treat every police pursuit of a fleeing suspect in the same way.  To take an extreme example for the purpose of illustration, if a police car were to follow a suspect for half an hour at a reasonable speed, all the time flashing its lights and activating its siren, while the police officer screamed "I'm going to get you!" out the window the entire time, it would be artificial to say that the pursuit began only at minute 31, if that is when the suspect accelerated to a high speed.

Thus, whether the Police Defendants had time for "hurried deliberation" is an issue of fact, and it is an unresolved issue of fact. According to Otero, pursuit began "the second that [the Police Defendants] decided to follow this guy after they noticed him handing out the drug packets." *Transcript of Motion for Summary Judgment Hearing*, May 30, 2024, at 37:22-24. It continued for seven blocks, at a low speed, before Ellison turned onto Jasper Street. *Id.; Memorandum in Support of Plaintiff's Response* at 13.

The police car emergency lights were turned on no later than the moment they reached the intersection of Clearfield Street and Frankford Avenue, two blocks before they reached Jasper Street, still at a normal rate of speed. *DSUMF* at ¶30. The Police Defendants also "hit" their siren an unknown number of times as they drove down Clearfield Street. Exhibit D at 34:1-36:17. They continued following Ellison after he drove through a red light at Clearfield at Emerald Streets. *DSUMF* at ¶¶ 35 and 36. On the basis of this evidence, Otero is entitled to argue to the jury that the Police Defendants in this case were not in the hyperpressurized environment which compels the "intent to harm" standard.

Also unresolved as a question of fact is whether a compelling justification existed for the Police Defendants to pursue Ellison. According to Police Directive 9.4, it did not. Ellison did not commit or attempt a forcible felony, and the Police Defendants had no probable cause to believe that he possessed a deadly weapon other than the car itself. Exhibit Q at 0014. It is not precisely clear how relevant Directive 9.4 is to the Police Defendants' liability under §1983.[5] However, it is surely relevant to understanding whether the Police Defendants believed a

---

[5] Numerous courts have assumed that the violation of a police regulation is irrelevant to the constitutional standard. *Koreny*, *supra*, at 2108 WL 1141513 *9; *Shields*, at 2022 WL 4586124 at *8; *Small*, at 2023 WL 4631575 at *12. However, all of these cases apply the "intent to harm" standard. Under a "conscious disregard" standard, it may be otherwise. Notably, in *Davis v. Township of Hillside*, 190 F.3d 167, 171 (3d Cir. 1999), the Court of Appeals for the Third Circuit wrote: "*Lewis* thus squarely refutes plaintiff's contention that the officers' violation of police department regulations, **which might be probative of recklessness or conscious disregard of plaintiff's safety**, suffices to meet the shocks-the-conscience test under the due process clause".

compelling justification existed at the time they initiated pursuit, since they were trained on Directive 9.4.  Hernandez's inaccurate representations that the police car never had its lights on could suggest that he considered the pursuit unjustified, and wanted to conceal it.  *DSUMF* at ¶ ¶48 and 88.  Alternatively, the finder of fact may credit Hernandez's deposition testimony that he never realized the lights were activated.  *Exhibit D* at 105:23-106:6.

Defendants have argued that the fact that Ellison was handing out drug samples created a compelling justification for pursuit, despite Directive 9.4.  *Transcript of Motion for Summary Judgment Hearing* at 21:5-9.  The finder of fact may ultimately agree.  However, this is a disputed issue of fact.

Because *Sauers* permits Otero to argue that Officers Kane and Hernandez violated the "conscious disregard of a substantial risk of harm" standard, and because undecided issues of material fact exist as to whether they indeed violated this standard, summary judgment is inappropriate on Otero's substantive due process claim.  Defendants' motion for summary judgment will be denied as to this claim.

B.      *Otero Cannot Show Intent to Harm*

Although Otero's §1983 substantive due process claim will remain in this case, I will grant Defendants' motion to the extent that they argue that Otero has not come forward with evidence supporting an argument that the Police Defendants acted with an intent to harm.

In *Lewis*, the United States Supreme Court specifically analogized due process cases involving police pursuits to those determining officer liability in a prison riot:  "In those circumstances, liability should turn on 'whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm.'"  523 U.S. at 852-3, *quoting Whitley v. Albers*, 475 U.S. 312, 320-321 (1986).  This

concept of malice and sadism should, therefore, be imported into its later holding that "high-speed chases with no intent to harm suspects physically or to worsen their legal plight do not give rise to liability under the Fourteenth Amendment, redressable by an action under §1983." 523 U.S. at 854.

The Court of Appeals for the Third Circuit has interpreted the "intent to harm" standard very narrowly.  No intent to harm was found in *Davis v. Township of Hillside*, 190 F.3d 167, 171 (3d Cir. 1999), even though the defendant police officer deliberately rammed a car fleeing at high speed.

Otero points to *Clark v. Merrell*, Civ. A. No. 19cv1579, 2021 WL 288791 at *5 (E.D. Pa. Jan. 28, 2021), where the judge refused to dismiss a §1983 claim on a 12(b)(6) motion, stating that the fact that the police defendant pursued a suspect on a motorcycle in a dangerous fashion even "in defiance of a direct order from his superior" not to pursue dirt bikes, combined with his "repeated attempts to conceal, cover up or simply lie" about the circumstances of the pursuit could support a finding that he acted with an intent to harm.  Otero argues that Officers Kane and Hernandez similarly acted in defiance of Regulation 9.4, and attempted to cover it up.

*Clark*, however, was a decision not to dismiss a claim immediately after the case was filed.  This is a summary judgment motion, where discovery is complete.  Neither the direct statements of the parties nor the other evidence in this case suggest that the Police Defendants intended to harm Ellison, physically or legally, and they certainly did not intend to harm Ms. Martinez.  Otero is entitled to argue that they harmed Ms. Martinez despite this, through conscious disregard of a substantial risk to her, but he has not shown the facts necessary to support a claim under the "intent to harm" standard.

C.      *Qualified Immunity*

Qualified immunity shields individual state actors from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Police officers are entitled to qualified immunity under §1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time they acted. *District of Columbia v. Wesby*, 538 U.S. 48, 62-3 (2018).

The Police Defendants in this case are not entitled to qualified immunity. *Sauers* was decided in 2018. Thus, a reasonable police officer acting in November, 2020, would have been aware that the level of culpability required to shock the conscience in a police pursuit context, and therefore violate a constitutional right, existed on a spectrum tied to the amount of time the police officer had to act, and the justification for engaging in the pursuit. *Sauers*, 905 F.3d at 723. *Donahue* and *Miller* were not decided until 2024, and *Shields* is a 2022 decision, so they could not have been in the minds of the Police Defendants in 2020.

Defendants argue that Officer Hernandez is entitled to qualified immunity because he was not the driver of the pursuing police car, and had no authority to control whether or not Officer Kane pursued Ellison. However, as Otero points out, Officer Kane was of equal rank with Officer Hernandez and had no authority to command Officer Hernandez to engage in a pursuit. Significantly, nothing in Officer Hernandez's testimony suggests that there was any disagreement between him and Officer Kane, or that the pursuit was solely the idea of Officer Kane. Exhibit D at, e.g., 96:17-19 (Officer Hernandez reading from his 483 Form: "My partner and I decided to pull the vehicle over based on the observations we made"). Defendants, therefore, have not shown that Officer Hernandez is entitled to qualified immunity.

D.    *The Monell Claims*

In *Monell v. Dep't of Social Services of the City of New York*, the United States Supreme

Court decided that a local government cannot be sued under §1983 for injury inflicted solely by

its employees or agents, under a *respondeat superior* theory:  "Instead, it is when execution of a

government's policy or custom, whether made by its lawmakers or by those whose edicts or acts

may fairly be said to represent official policy, inflicts the injury that the government as an entity

is responsible under §1983."  436 U.S. 658, 694 (1978).

More specifically, the United States Supreme Court has ruled that the inadequacy of

police training may serve as the basis for a *Monell* claim if the failure to train amounted to

deliberate indifference to the rights of the people with whom the police come into contact:

> It may seem contrary to common sense to assert that a municipality will actually have a
> policy of not taking reasonable steps to train its employees.  But it may happen that in
> light of the duties assigned to specific officers or employees the need for more or
> different training is so obvious, and the inadequacy so likely to result in the violation of
> constitutional rights, that the policymakers of the city can reasonably be said to have been
> deliberately indifferent to the need.

*City of Canton, Ohio v. Harris*, 489 U.S. 378, 388, 390 (1989).

However, failure to train is not an easy argument to make.  As the *Canton* court warned:

"In resolving the issue of a city's liability, the focus must be on the adequacy of the training

program in relation to the tasks the particular officers must perform."  *Id*.  It is not enough to

show that (a) a particular officer was unsatisfactorily trained, or that an otherwise sound program

has occasionally been negligently administered; (b) a particular accident could have been

avoided if an officer had better or more training, where the program is adequate to enable

officers to respond to usual and recurring situations; or that (c) adequately trained officers made

a mistake.  *Id*. at 390-1.

Similarly, to prove a claim of failure to supervise, a plaintiff must show a failure which reflects a policy of deliberate indifference to constitutional rights.  *Reynolds v. Municipality of Norristown*, Civ. A. No. 15-16, 2015 WL 4450979 at *11 (E.D. Pa. July 17, 2015), *citing Jewell v. Ridley Township*, 497 Fed. App'x 182, 186 (3d Cir. 2012), *and see Ashley v. Kosehba*, Civ. A. No. 22-982, 2023 WL 6200805 at *6 (M.D. Pa. Sep. 22, 2023) ("Under a failure to supervise theory, a plaintiff must show (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights") (internal citations omitted).

As above, Otero has asserted claims against the City of Philadelphia under both failure to train and failure to supervise.  Defendants argue that both claims should be dismissed as a matter of law.  I agree that Otero has not shown a basis for pursuing a case under the theory of a failure to supervise.  However, he has shown the existence of unresolved issues of material fact regarding a failure to train.

      1.    *Failure to Train*

Defendants argue that Otero cannot show failure to train because, although his expert witness, Christopher Chapman, Ph.D., offered opinions on how to better train police officers on pursuit, the City already offers a robust training program.  In essence, their argument is that Otero falls into the second of what we might call the "three ways to fail to show a failure to train claim" described in *Canton*, *i.e.*, calling for "better or more training" where the existing program is "adequate to enable officers to respond to usual and recurring situations."  489 U.S. at 391.

As Defendants point out, Directive 9.4 arguably requires more care in instigating pursuits that is required by the Constitution.  Further, any officer involved in an unjustified pursuit is to

be retrained.  Training on pursuit is also conducted proactively, and can be given at roll call.  In this case, Officers Kane and Hernandez were placed on desk duty.

Nevertheless, Otero has come forward with analytical evidence showing that, according to the Philadelphia Police Department's own figures, over half of all police pursuits were unjustified in every year from 2016 to 2020 (the last year assessed), for an average of 58.7% unjustified pursuits.  Exhibit R and *Plaintiff's Memorandum of Law* at 58.  During those years, 36 civilians were injured or killed, as were 34 suspects and 11 police officers, as a result of police pursuits.  Exhibit R and *Plaintiff's Memorandum of Law* at 56.  Of these, three were killed, other than Ms. Martinez, although the data does not indicate whether the deaths were of civilians, suspects, or officers.  Exhibit R and *Plaintiff's Memorandum of Law* at 57.

This data does not reveal every important detail – for example, there is no way to know whether the injuries and deaths occurred during justified or unjustified pursuits.  Further, 58.7% violation of Directive 9.4 is definitively not equivalent to 58.7% constitutional violations.

However, viewed in the light most favorable to Otero, the data attached as Exhibit R is relevant toward the issue of whether the City was on notice that its training on pursuit was inadequate.  Defendants have not argued that the City took action in response to this data.  Otero is entitled to argue to a jury that for the City to create an apparently robust training policy, and then watch it fail in practice over five years without taking action, demonstrates deliberate indifference to the rights of people with whom the police come into contact, under *Monell*.[6]

---

[6] Or, as phrased in *Canton*, *supra*, Otero may argue that in light of the duties assigned to pursuing officers the need for more or different training was so obvious, and the inadequacy of the current training so likely to result in the violation of constitutional rights, that the failure to address the issue showed deliberate indifference.

2.  *Failure to Supervise*

The parties disagree as to whether Otero's Complaint can be read to include a §1983 claim of failure to supervise.  This need not be decided here since the evidence does not support such a claim.

It is not at all difficult to accept as reasonable an argument that Captain Rosario, Sergeant Bloom, Sergeant Casale, and/or Lieutenant Mella, should have stopped the pursuit of Ellison's car.  Given that both Captain Rosario and Sergeant Bloom testified that the pursuit should have been stopped, and that Captain Rosario testified that a failure to stop the pursuit would constitute negligence, government inaction leading to Ms. Martinez's death is not hard to identify.

Nevertheless, Otero has not come forward with evidence that the City has a policy or custom of failing to respond to radio reports of police pursuits, as is required to state a *Monell* claim.  Captain Rosario testified that he did not hear the transmission from Officer Hernandez about pursuing Ellison on Jasper Street.  Plaintiff's Exhibit J at 93:11-19.  Sergeant Bloom testified that he could not recall whether he heard that transmission.  Plaintiff's Exhibit M at 49:4-11.

Thus, even construing the evidence in favor of Otero, he has shown, at most, some degree of misfeasance on this particular occasion, but not a policy or custom.  Accordingly, Defendants' motion will be granted as it pertains to a claim of failure to supervise.

E.      *State Negligence Claims*

Finally, Defendants move to dismiss the state negligence claim against Officer Hernandez on the basis that he was not operating the police vehicle during the pursuit.  They argue that the only applicable exception to state immunity from negligence claims under the

26

Political Subdivision Tort Claims Act, 42 Pa. C.S. §8541 *et seq*., is the motor vehicle exception set forth at §8542(b)(1).  It speaks to the negligent "operation" of a motor vehicle.  *Id*.

Otero has not responded to Defendants' argument in this regard.  Given the apparent logic of Defendants' argument, and the lack of a response, I will grant Defendants' motion and dismiss the state law negligence claim against Officer Hernandez.

IV.    *Conclusion*

In accordance with the above discussion, I will grant Defendants' Motion for Partial Summary Judgment in part, and deny it in part, as described above.

BY THE COURT:

*Scott W. Reid*

_____
SCOTT W. REID
UNITED STATES MAGISTRATE JUDGE